UNITED STATES of America, Plaintiff–Appellee,

v.

Raymond H. McDONALD, a/k/a Play, a/k/a Randolph Smith, Defendant–Appellant.

No. 93–5264.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 2, 1995.

Decided Aug. 4, 1995.

**ARGUED**: Douglas Leroy Thomas, Hempstead, NY, for appellant. Thomas Ernest Booth, U.S. Dept. of Justice, Washington, DC, for appellee. **ON BRIEF**: J. Preston Strom, Jr., U.S. Atty., Alfred W. Bethea, Jr., Asst. U.S. Atty., U.S. Dept. of Justice, Washington, DC, for appellee.

Before ERVIN, Chief Judge, and MICHAEL and MOTZ, Circuit Judges.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MICHAEL and Judge MOTZ joined.

## OPINION

ERVIN, Chief Judge:

Raymond H. McDonald appeals his convictions for conspiring to distribute cocaine base, in violation of 21 U.S.C. § 846, and using a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

McDonald claims that (1) the indictment against him should be quashed because of prosecutorial misconduct, (2) his convictions should be reversed because the district court refused to suppress evidence obtained in violation of his rights under the Fourth Amendment to the United States Constitution, and (3) his § 846 sentence should be vacated because the district court erred in its calculation of the amount of crack cocaine for which McDonald was to be held accountable. Finding no error, we affirm McDonald's convictions and sentences.

### I.

Around 3:30 in the afternoon of May 25, 1991, Corporal Troy Knight of the South Carolina Highway Patrol ("SCHP") attempted to pull over a Chevrolet Nova for speeding on the Old Marion Highway in Florence, South Carolina. Refusing to stop, the car accelerated to a speed of 100 miles per hour. The Nova eventually ran into a ditch near Betty's One Stop convenience store and the Mars Bluff Apartments. Its driver, whom Corporal Knight identified as a black male, fled into nearby woods carrying a paper bag. The officer lost sight of the suspect, and other troopers arrived on the scene shortly thereafter.

Meanwhile, Mars Bluff residents Pam Jose and Lisa Day saw a police car at Betty's One Stop as they were returning home to their apartment, Number 14. The women also saw an African–American man run to Apartment 11 from the side of the building, request admittance to the premises, and enter that apartment in a frantic manner. Approximately fifteen to twenty minutes later, after seeing more police cars in the area, Jose and Day phoned Betty Squires, who operated Betty's One Stop, to see if her establishment had been robbed. Day recounted what she had seen to Squires, who subsequently told her husband, who in turn informed an unidentified member of the SCHP about Day's phone call.

At approximately 4:30 and as a result of the information path outlined above, Corporal Knight received a dispatch indicating a possible forced entry by a black male into Apartment 11 at the Mars Bluff complex.

Fearing a possible hostage situation, Knight requested assistance from sheriff's deputies. Law enforcement officers then knocked on the door and windows of Apartment 11 and received no response, although they did hear music coming from inside. After surrounding the building, the officers forcibly entered the apartment. They found the unit unoccupied and spotted a safe, a set of scales, some baking soda, and other objects eventually admitted into evidence at McDonald's trial. Pam Jose testified that approximately one hour elapsed from the time law enforcement officials first knocked on the door of Apartment 11 and the time they entered the residence.

Later that day, Mars Bluff residents Jose, Day, and John Hudson, who had been advised by the police to report any suspicious conduct, noticed that several men were unloading property from Apartment 11 into a red Honda and a BMW that had been parked beside the building at the time of the initial search. Day phoned the police to report her observations, and Hudson followed the BMW to a local highway, at which time he called law enforcement as well. Acting on these reports, officers proceeded to the scene, and Trooper David Whatley pulled over the red Honda, which he noticed had temporary license tags. The occupants of the car, Tyrone Burgess and Mark Reid, informed Whatley that another passenger had gotten out of the car a few minutes earlier, and Hudson confirmed Burgess and Reid's statement. After Burgess consented to a search of his Honda, officers seized a loaded semi-automatic machine gun, approximately 400 grams of crack cocaine, and a scale.

Nearby, Trooper Thomas Campbell spotted appellant Raymond H. McDonald, who fit the general description of the passenger reported to have left Burgess' Honda. Campbell asked McDonald to accompany him to Burgess' car, and McDonald indicated that he had "no problem with that." When asked for identification, McDonald said that he did not have any, but he wrote his name down for the trooper as "Randolph Smith." After Reid and Burgess denied knowing McDonald, he was released. Later, Reid and Burgess told law enforcement officers that the drugs and weapon found in the vehicle belonged to McDonald.

After interviewing the manager of the Mars Bluff complex, officials with the Drug Enforcement Agency ("DEA") learned that the residents of Apartment 11, McDonald and a woman named Sonja Graham, were being evicted for non-payment of rent, effective June 23 at midnight. On June 24, with the consent of the owner of the property, DEA agents searched the apartment and seized numerous drug-related items, including the safe, a gun magazine containing several bullets, and a stove burner.

On July 19, 1991, DEA agent Thomas Jacobs searched the abandoned Chevrolet Nova at the service station to which it had been towed. The station manager gave Jacobs a key ring that contained keys both to the abandoned Nova and to Apartment 11. On October 31, 1991, DEA agents arrested McDonald pursuant to a warrant in Queens, New York. After being advised of his *Miranda* rights, McDonald told federal agents that he was not the "main individual" in South Carolina, and that he knew bigger drug dealers in New York.

On November 21, 1991, a grand jury sitting in the United States District Court for the District of South Carolina indicted McDonald for conspiring to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846. Prior to issuing its indictment, the grand jury had heard testimony to the effect that Reid and Burgess, whose statements were used as evidence against McDonald, had taken polygraph tests. Specifically, Agent Jacobs testified that:

> Reid and Burgess admitted to agents prior to taking a polygraph they had purchased crack and powder cocaine from McDonald and also they had sold crack cocaine for McDonald on several occasions.

Sometime later, while examining Jacobs' testimony that Burgess and Reid attributed possession of the drugs found in Burgess' car to McDonald, the grand jury foreperson asked: "It could belong to them, though; couldn't it?" In a non-responsive answer, Jacobs replied:

They are part of—they're two of the known persons that he conspired with that day.

Two months after handing down the first indictment, the same grand jury issued a superseding indictment charging McDonald, Reid, and Burgess with conspiring to distribute cocaine base, in violation of 21 U.S.C. § 846, and using a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

At trial, McDonald made a motion to quash the indictment against him, which the district court denied summarily. In addition, McDonald moved to suppress the physical evidence seized during the post-eviction search of his apartment and the searches of his Chevrolet Nova and Burgess's Honda, as well as his post-arrest admissions. The trial court also denied this motion, rejecting McDonald's argument that admission of the evidence violated his Fourth Amendment rights. The court ruled that the initial warrantless search was justified based on both the exigent circumstances and hot pursuit exceptions to the warrant requirement. Additionally, the court ruled that the stop of Burgess' Honda was justified by reasonable suspicion based on the earlier incident outside Apartment 11 and by the car's temporary license tags. The court also found that Burgess had consented to a search of his vehicle. The post-eviction apartment search was upheld based on the landlord's consent. Finally, the court admitted McDonald's post-arrest admissions to DEA agents on the ground that McDonald had initiated the conversation leading to the statements.

The jury convicted McDonald on both the § 846 and § 924(c) counts. The district court found McDonald's crimes to have involved more than five kilograms of crack cocaine and assigned him a base offense level of forty. Based on that figure, the court sentenced McDonald to consecutive sentences of 576 months on the conspiracy count and 60 months on the weapons charge.

## II.

McDonald rests his argument that the district court should have quashed the indictment against him on allegations of prosecuto-rial misconduct. Specifically, he claims that the testimony by Agent Jacobs informing the grand jury that Reid and Burgess had taken polygraph tests misled the jury by implying that the two had passed their tests, even though Reid's results were inconclusive and Burgess' results indicated deception. As other evidence of misconduct, McDonald points to several misstatements by Agent Jacobs. For example, the officer testified that Jose and Day saw a black male run from the woods into Apartment 11. In fact, Jose and Day had seen the man come from the side of the building, not the woods. Agent Jacobs offered other evidence, however, that McDonald was the suspicious individual who had entered Apartment 11, including McDonald's own admission to Burgess. The other alleged misstatements are extremely minor and not beyond the ordinary mischaracterizations one might expect in any verbal account of a prior event.

■■■ Relief from an erroneous indictment after a case has been decided by a petit jury is rarely granted. "Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 802, 109 S.Ct. 1494, 1500, 103 L.Ed.2d 879 (1989). We will not hear "a challenge to the reliability or competence of the evidence presented to the grand jury," and "[t]he mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 261, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988); *see also United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941, 89 L.Ed.2d 50 (1986) (petit jury's guilty verdict rendered harmless any error in the grand jury's charging decision that may have flowed from the violation of Federal Rule of Criminal Procedure 6(d)); *United States v. Schmidt,* 935 F.2d 1440, 1446 n.4 (4th Cir.1991) (noting that "a post-verdict claim of prosecutorial interference with a grand jury's determination of probable cause is rendered harmless by the verdict of a petit jury," absent a fundamental defect).

■ The United States Supreme Court has recognized, nonetheless, that an indictment may be quashed on the basis of prosecutorial misconduct, but only where the government's misdeeds "'substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia,* 487 U.S. at 256, 108 S.Ct. at 2374 (quoting *Mechanik,* 475 U.S. at 78, 106 S.Ct. at 945–46). The Court's ruling in *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), made clear that a failure by the government to disclose even substantial exculpatory evidence to the grand jury does not constitute such misconduct. *See id.* at 55, 112 S.Ct. at 1746 (holding that a district court may not dismiss a facially valid indictment because the government failed to disclose to the grand jury substantial exculpatory evidence in its possession).

Before applying the standards discussed above to the facts of this case, we must first decide the standard by which we review the district court's summary denial of McDonald's motion to dismiss the indictment. Courts have disagreed regarding the appropriate standard. *See Guam v. Palomo,* 35 F.3d 368, 371 (9th Cir.1994) (recognizing a conflict over whether such issues are reviewed *de novo* or only for an abuse of discretion), *cert. denied,* —— U.S. ——, 115 S.Ct. 750, 130 L.Ed.2d 650 (1995). For example, in *United States v. Bourgeois,* 950 F.2d 980, 984 (5th Cir.1992), the Fifth Circuit "review[ed] the district court's findings regarding prosecutorial misconduct for clear error." In contrast, the Third Circuit "review[ed] the district court's denial of a motion to dismiss an indictment alleging prosecutorial misconduct for an abuse of discretion" in *United States v. Ismaili,* 828 F.2d 153, 163 (3d Cir.1987).

■ We have not addressed this issue directly before today. Examining a claim that a wholly mistaken indictment was "supported by no evidence of [the defendant's] criminal conduct" in *United States v. Mills,* 995 F.2d 480, 486 (4th Cir.1993), we noted that "the trial court *acted within its discretion,* based on the evidence before it at the time, by permitting the indictment to go to the jury." *Id.* at 489 (emphasis added). However, the *Mills* court emphasized that the defendant "[did] not argue that the Government intentionally engaged in misconduct," *id.* at 488, and stated only in very general terms: "We review indictments for constitutional error and prosecutorial misconduct," *id.* at 486. Because the issue of prosecutorial misconduct is primarily a fact-based inquiry, we now hold that a district court's findings on that issue are reviewed for clear error.

■ In this case, however, the district court made no factual findings regarding the existence of prejudicial misconduct by the government prior to denying McDonald's motion. Therefore, as the government concedes in its brief, we must review McDonald's claim of prejudicial governmental misconduct *de novo.* Brief for the United States at 2. Under the law of this circuit, Agent Jacobs' reference to the fact that Reid and Burgess had taken polygraph tests certainly was improper. *Cf. United States v. A & S Council Oil Co.,* 947 F.2d 1128, 1134 (4th Cir.1991) (holding that results of a polygraph examination are inadmissible as both inculpatory and exculpatory evidence). The remark, however, added little to the credibility of the hearsay statements about which Agent Jacobs had testified earlier. The jury might even have assumed that Reid and Burgess failed their tests because the government failed to produce the results. In addition, this is not a situation in which the allegedly misleading testimony concerns evidence that exculpates a defendant. Of course, under *Williams,* 504 U.S. at 50, 112 S.Ct. at 1743–44, a prosecutor is under no obligation to produce even substantially exculpatory evidence. However, the government's creation or acceptance of an erroneous impression that related to such evidence could support a defendant's argument that a supposed mistake was intentional misconduct. In this case, however, the misimpression was not of that type. Furthermore, the government produced other substantial evidence against McDonald, both before the grand jury and, more importantly, at trial. Given the lack of prejudice to McDonald and the dearth of evidence indicating bad faith on the government's part, Mc-

Donald is not entitled to have the indictment against him quashed.

## III.

 In evaluating McDonald's Fourth Amendment claim, this court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Rusher,* 966 F.2d 868, 873 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). McDonald contends that the original warrantless search of his residence violated his Fourth Amendment right to be free from unreasonable searches, while the government asserts that the entry was justified by exigent circumstances and under the hot pursuit doctrine. As his counsel conceded at oral argument, McDonald lacks the requisite standing to challenge directly the subsequent searches of his residence, Burgess' Honda, and the Chevrolet Nova. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that a defendant must have a reasonable expectation of privacy in the item searched or seized). McDonald therefore argues that the illegal search of his apartment on the afternoon of May 25, 1991, tainted the physical evidence obtained during those searches, his false self-identification to law enforcement officers, and his post-arrest admissions to DEA agents.

 Because there is an independent basis for admitting the other evidence, we need not address whether the initial search of Apartment 11 falls within the exigent circumstances or hot pursuit exceptions to the Fourth Amendment's warrant requirement. Assuming for the sake of argument that the warrantless search of McDonald's apartment was illegal, the evidence seized during the later searches is not the tainted "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (holding that evidence obtained by "means sufficiently distinguishable to be purged of the primary taint" need not be suppressed). The Supreme Court has recognized that the Fourth Amendment does not require the suppression of evidence initially discovered during the government's illegal entry of private premises, if that evi-

dence is also uncovered during a later legal search that is wholly independent of the improper one. *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 2536, 101 L.Ed.2d 472 (1988) ("The ultimate question ... is whether the [legal] search ... was in fact a genuinely independent source of the information and tangible evidence at issue here."); *see also United States v. Curtis,* 931 F.2d 1011, 1013 (4th Cir.1991) ("Evidence that is initially discovered through unlawful means but is later acquired through lawful means independently of the initial unlawful discovery is admissible.").

In this case, there is an independent source for all of the evidence contested by McDonald. Officer Whatley had noticed that Burgess's car had temporary license tags when he detained the vehicle. Under South Carolina law, this entitled Whatley to conduct an investigatory stop in order to determine whether the car's owner was in violation of state law requiring permanent tags within thirty days of a vehicle's purchase. In *United States v. Hassan El,* 5 F.3d 726, 730 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994), we adopted a standard by which to assess the legality of a traffic stop that ignores an officer's subjective motivations and "relies solely on the objective facts and circumstances surrounding the stop." Applying that objective test, Officer Whatley's independent basis for stopping Burgess's vehicle removes any taint from the questionable apartment search. Therefore, we need not decide whether the police had reasonable suspicion to stop Burgess's Honda under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), based on the citizen reports of a possible suspect seen entering Apartment 11 and later of men loading property from that apartment into a similar vehicle.

 Having determined that the police had a legitimate basis on which to stop Burgess' Honda, the admissibility of the other evidence against McDonald becomes apparent. The district court's finding that Burgess consented to a search of his vehicle after the stop is not clearly erroneous, and the admission of evidence seized at that time therefore does not violate the Fourth

Amendment. *See Schneckloth v. Busta-monte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973) ("[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). Likewise, McDonald's identification of himself as "Randolph Smith" was not tainted by the earlier entry into Apartment 11. The district court found that McDonald falsely identified himself after voluntarily accompanying Officer Campbell to Burgess' Honda, and there is nothing in the record to contradict that finding. Similarly, McDonald's post-arrest admissions to DEA agents, which occurred several months later, were not tainted by the allegedly illegal search. As found by the district court and supported in the record, McDonald initiated the conversation with agents after being arrested pursuant to a valid warrant—one obtained without reliance on any evidence discovered as a result of the initial entry into Apartment 11. Additionally, the landlord consented to the June 24 search of McDonald's former apartment after his eviction for nonpayment of rent. As for the search of McDonald's Chevrolet Nova, that vehicle was abandoned off a public highway prior to the first entry into Apartment 11. *See, e.g., United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir.) ("When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had."), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). In sum, an independent source existed for all of the evidence challenged by McDonald, and the district court did not err by denying his suppression motion.

### IV.

Finally, McDonald challenges his conspiracy sentence, arguing that the district court erred by holding him accountable for more than five kilograms of crack cocaine. At sentencing, the government must prove the amount of drugs involved in a given conspiracy by a preponderance of the evidence. *United States v. Gilliam,* 987 F.2d 1009, 1013 (4th Cir.1993). We review a sentencing court's determination of this matter for clear error only. *United States v. Banks,* 10 F.3d 1044, 1058 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1850, 128 L.Ed.2d 475, *and cert. denied,* —— U.S. ——, 114 S.Ct. 2681, 129 L.Ed.2d 814 (1994).

In this case, the pre-sentence investigation report assigned an offense level of forty to McDonald, based on a quantity of five to fifteen kilograms of crack cocaine. At trial, Donald Pierre, a friend of McDonald's since high school, testified that McDonald admitted to selling approximately one kilogram of crack cocaine per month. Agent Jacobs indicated that Pierre earlier had declared that McDonald bragged about dispensing approximately one and one-half kilograms of crack cocaine every month for a period of six to eight months. Pierre also testified that he personally had observed McDonald sell crack cocaine on a daily basis. As further evidence, Agent Jacobs seized over 400 grams of crack cocaine from Burgess' car. In addition, Reid told Agent Jacobs that he had obtained two or three kilograms of crack cocaine from McDonald, Burgess indicated that he had received one kilogram from McDonald, and other individuals told Agent Jacobs that they regularly purchased cocaine base from McDonald. The district court specifically credited the testimony of Jacobs and Pierre. In light of this evidence, the district court did not err in finding that McDonald's offenses involved more than five kilograms of crack cocaine.

### V.

McDonald's constitutional rights were not violated either before the grand jury or at trial, and the district court did not err in determining the amount of cocaine attributable to him. Accordingly, his convictions and sentences are hereby

*AFFIRMED.*