**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                  No. 94-5403

HUMPHREY JONES,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CR-93-452-A)

Argued: February 1, 1996

Decided: May 6, 1996

Before NIEMEYER and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Benjamin Smith, ENGLISH & SMITH, Alexan-
dria, Virginia, for Appellant. Andrew Gerald McBride, Assistant
United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:**
Helen F. Fahey, United States Attorney, Rena M. Johnson, Special
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Humphrey Jones was convicted for multiple offenses arising from the sale of fourteen grams of crack cocaine.[1] On appeal he challenges the sufficiency of the evidence on the conspiracy conviction. He also challenges his sentence, arguing that the district court erred in adopting the findings in the presentence report that included seven additional grams of crack cocaine as "relevant conduct" under section 1B1.3 of the Sentencing Guidelines. For the following reasons, we affirm Jones's conspiracy conviction, but we vacate his sentence and remand for resentencing.

I.

Jones was a correctional officer at Lorton Reformatory in Lorton, Virginia. Anthony Mitchell, also a correctional officer at Lorton, acted as a confidential informant for an undercover operation targeting drug trafficking by correctional officers and staff members. After meeting at a social engagement, Jones told Mitchell that he could provide Mitchell with any amount of cocaine. Jones then gave Mitchell his pager number and told him to contact him when he wanted to make a purchase.

At trial the Government presented evidence of two taped telephone conversations between Mitchell and Jones. In the first, Mitchell asked

_____

[1] The jury found Jones guilty of conspiracy to distribute and to possess with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C. § 846; attempted possession with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C.§§ 841(a)(1) & 846; attempted distribution of 5 grams or more of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846; and illegal use of a communication facility (2 counts) in violation of 21 U.S.C. § 843(b).

2

Jones how much cocaine he could deliver, and Jones replied, "[t]hat's never the question. The question is how much do you want?" Jones agreed to sell Mitchell two quarter ounces (fourteen grams) of crack cocaine, with delivery to take place at 8:00 p.m. in the Bayvue area (Northern Virginia) on Monday, November 15, 1993. [2] In the second recorded conversation, Jones confirmed that he was ready to deliver. An unrecorded conversation a day later confirmed the deal, according to Mitchell.

Mitchell planned a second cocaine purchase for that same Monday. He was to buy cocaine from John Scott at 6:00 p.m., also at Bayvue. At 5:30 on the appointed day (Monday), Scott called Mitchell to confirm the sale. Approximately four minutes after Scott's confirmation call, Jones called Mitchell and asked to move his purchase up from 8:00 p.m. to 6:00 p.m. Mitchell agreed.

Mitchell testified that he saw Jones next door to the Bayvue Apartments talking to Scott when he arrived to purchase cocaine from Scott. After Scott sold cocaine to another undercover officer, additional officers arrived on the scene and attempted to arrest him. Scott fled but Jones was arrested. Scott was arrested the following day.

Under a grant of immunity, Scott testified as follows. He was a cocaine dealer who lived at Bayvue, and he had known Jones since 1992, having sold cocaine to him at least twice. On November 15 at about 5:30 p.m., Scott was in a restaurant (before he was to meet Mitchell) when Jones came up to him. Shortly thereafter, Scott showed Jones an incoming number on his pager to see if Jones recognized it, and Jones immediately identified it as Mitchell's number. Also, in response to an inquiry from Jones, Scott indicated that he was selling large amounts of crack. Scott further agreed to obtain two quarter ounces of crack for Jones. And Scott said that Jones told him that he (Jones) would be meeting Mitchell later on.

James Carlton, who worked with Jones at Lorton, also testified for the Government. Carlton was arrested November 16, 1993 (the day after Jones's arrest), for accepting a bribe to allow drugs into Lorton.

_____

[2] The Bayvue area included a shopping center and apartments. The area was apparently known as a location for drug transactions.

3

Jones and Carlton were confined in the same holding cell. Carlton testified that Jones told him that he and Scott were to deliver a package in a parking lot and that Scott had "left him just standing there." Carlton also said that Jones had smirked when he discussed his (Jones's) false alibi, a disabled car.

FBI Special Agent Daniel C. Sparks, who interviewed Jones after he was arrested, testified that Jones admitted that he was in the parking lot at Bayvue to sell cocaine to Mitchell. Agent Sparks prepared a written statement to that effect, but Jones refused to sign it. Jones did, however, write and sign a statement in which he admitted that he at least intended to contact others "to arrange a situation" for Mitchell to buy two quarter ounces of crack cocaine. He also wrote that he was seeking treatment for drug and alcohol problems.

Jones testified, admitting that his voice was on the taped conversations, that he knew what the expression a "quarter" of crack meant, that he knew the price of a "quarter", and that Scott was a distributor of cocaine. Finally, Jones admitted that he called Mitchell after his meeting with Scott and agreed to meet him in the Bayvue parking lot at 6:00 p.m.

O'Neal Johnson, Jones's roommate, testified about Jones's ability to obtain cocaine, stating that on one occasion in early November 1993 Jones, Johnson and an unidentified woman "entertained" themselves with crack Jones supplied for them to smoke. When asked how much crack Jones provided on that occasion, Johnson replied, "I don't know exactly how much cocaine there was, but it was enough to satisfy the three of us for a couple of hours." On cross-examination, Johnson admitted that he was spending $400 or $500 every two weeks to feed his crack habit and that on occasions he took Jones's crack without his permission.

The jury convicted Jones on all counts, and he received a 97-month term of imprisonment, the low end of the 97-121 month guideline range. In rendering sentence, the district court adopted the findings in the presentence report, which recommended a sentence based on 21 grams of crack cocaine. Purporting to rely on Johnson's testimony, the presentence report added seven grams of crack cocaine to the fourteen grams attributable to the busted sale with Mitchell. If, as

4

Jones argues, he should not have been sentenced based on the additional seven grams, then he would have faced a sentencing guideline range of 78-97 months; indeed, Jones falls into the lower guideline range if he was responsible for any quantity less than 20 grams in total.

II.

Jones argues that the evidence was insufficient to support his conspiracy conviction because it showed no more than a casual, isolated, buyer-seller relationship between himself and Scott. That is, it showed no more than a "one-shot agreement" by Scott to supply Jones with a quarter ounce of crack cocaine for resale to Mitchell.[3] In support of this argument, Jones relies on a number of cases from other circuits that have held that evidence of a buyer-seller relationship fails to establish a conspiracy to distribute drugs. See, e.g., United States v. Clay, 37 F.3d 338, 341-43 (7th Cir. 1994); United States v. Smith, 34 F.3d 514, 523 (7th Cir. 1994); United States v. Lennick, 18 F.3d 814, 819 (9th Cir.), cert. denied, 115 S. Ct. 162 (1994); United States v. Price, 13 F.3d 711, 727-28 (3d Cir.), cert. denied, 114 S. Ct. 1863 (1994); United States v. Townsend, 924 F.2d 1385, 1394-95 (7th Cir. 1991).

While we agree with Jones to the extent that evidence of a buyer-seller relationship (standing alone) may not be sufficient evidence upon which to base a conspiracy conviction, evidence of a buyer-

_____

[3] This court, of course, reviews sufficiency of the evidence challenges to determine whether, after viewing the evidence in the light most favorable to the Government, any rationale trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). To establish a conspiracy to possess with intent to distribute drugs, the Government must show (1) an agreement between two or more persons, tacit or express, to possess drugs with intent to distribute; (2) that the accused willfully joined the conspiracy; and (3) that the accused joined with intent to accomplish the criminal purpose of the conspiracy. See United States v. Clark, 928 F.2d 639, 641-42 (4th Cir. 1991). "Knowledge and participation in the conspiracy may be proved by circumstantial evidence." United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991); see United States v. Meredith, 824 F.2d 1418, 1428 (4th Cir.), cert. denied, 484 U.S. 969 (1987).

5

seller relationship is relevant (i.e., probative) on the question of whether a conspiratorial relationship exists. United States v. Mills, 995 F.2d 480, 485 n.1 (4th Cir.), cert. denied , 114 S. Ct. 283 (1993). Put another way, evidence of a "one-shot agreement" where a seller of drugs knows the buyer plans to resell the drugs to another is relevant on the question of whether the seller and the buyer have agreed to work together to further the distribution to third parties.

In this case, the jury was presented with evidence from which it could reasonably infer that Scott knew Jones planned to resell the fourteen grams of crack cocaine to Mitchell.**4** There is also additional evidence here. Both Scott and Jones were together in the Bayvue parking lot at the time Mitchell was to purchase the drugs. Indeed, Jones even admitted (in a written statement given to Agent Sparks) that he "would have contacted a few people to arrange a situation" for Mitchell to buy crack cocaine. When the police arrived, Scott fled and Jones was apprehended. According to Carlton, Jones said that he and Scott were to deliver a package in a parking lot and that Scott had "left him just standing there." From that evidence a jury could reasonably infer that Jones and Scott knowingly joined together to sell drugs to Mitchell. That, by definition, is a drug conspiracy. We therefore affirm Jones's conspiracy conviction.**5**

_____

**4** When there is a large quantity of drugs being sold, evidence of a "one-shot agreement" standing alone may be sufficient evidence to support a conspiracy conviction. See id. In this case, although the Government presented evidence that fourteen grams of crack cocaine is a distributable quantity, we are not required to decide whether that amount is large enough by itself that a jury could reasonably infer all the elements of a conspiracy based just upon Scott agreeing to sell this amount to Jones.

**5** On January 26, 1996, a few days before argument, we denied Jones's motion to file a pro se supplemental brief. By that time, however, the government had responded in its brief to Jones's pro se argument that the evidence was insufficient to sustain his conviction for attempted possession with intent to distribute crack cocaine (Count 2) and for attempted distribution of crack cocaine (Count 3). Jones's counsel then argued the issue in the reply brief. Because counsel for both sides addressed the issue in the formal briefing, we have therefore considered it. We conclude that the evidence, which we discuss fully in Part I of this opinion, is sufficient to sustain Jones's conviction on Counts 2 and 3 of the superseding indictment.

III.

As we have noted, Jones's sentence was not based exclusively upon the attempted sale of fourteen grams of crack cocaine to Mitchell. The Government also argued, and the district court accepted, that an additional seven grams of crack cocaine should be included as "relevant conduct" under section 1B1.3 of the Sentencing Guidelines.

We, of course, review a district court's factual findings as to the quantity of drugs attributable to a defendant for clear error. 18 U.S.C. § 3742(e); United States v. McDonald, 61 F.3d 248, 255 (4th Cir. 1995); United States v. Brooks, 957 F.2d 1138, 1148 (4th Cir.), cert. denied, 505 U.S. 1228 (1992). At sentencing the Government must prove the amount of drugs attributable to a defendant by a preponderance of the evidence. See, e.g., McDonald, 61 F.3d at 255; United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir. 1993). A defendant may not, however, be sentenced in violation of the Constitution, which includes the right to due process of law. See United States v. Inglesi, 988 F.2d 500, 502 (4th Cir. 1993); United States v. Headspeth, 852 F.2d 753, 755 (4th Cir. 1988).

Here, the district court included the additional seven grams based on the presentence report. The presentence report said that "trial testimony from O'Neal Johnson, Mr. Jones' roommate and Lorton employee, revealed that Jones sold Johnson $400 worth of crack cocaine between November 1, 1993 and November 13, 1993." The presentence report further noted that testimony at trial showed that the price of a quarter ounce (seven grams) of crack cocaine at that time in Northern Virginia was $300. "Therefore," according to the presentence report, "Humphrey Jones distributed at least an additional 7 grams of crack cocaine to O'Neal Johnson. This brings the total amount of crack cocaine distributed by Humphrey Jones between November 1, 1993 and November 15, 1993 to 21 grams."

Jones argues (and the Government tacitly concedes) that the presentence report is wrong on two facts. First, Johnson never testified at trial that Jones sold him $400 worth of crack cocaine between November 1, 1993 and November 13, 1993. Second, while Johnson did testify that he, Jones, and an unidentified woman "entertained" themselves "for a couple of hours" with crack cocaine on an occasion

7

in early November 1993, Jones did not in fact distribute all of the cocaine to Johnson. Thus, if there were in fact seven grams of cocaine, Johnson was not the recipient of all seven grams.

On appeal the Government states that the factual errors in the pre-sentence report were a result of the report's reliance on an FBI form FD-302 report. In particular, instead of relying upon Johnson's trial testimony as it purported to do, the presentence report relied upon interview notes memorialized in an FD-302 report written by Agent Sparks to reach the conclusion that Jones sold Johnson $400 worth of crack cocaine. Agent Sparks had interviewed Johnson after Jones's arrest, and during the interview Johnson had estimated that the crack cocaine that Jones supplied for himself, Johnson, and the unidentified woman would have cost approximately $400. The FD-302 report was not a part of the record, and neither Jones, nor his counsel, nor the district court were ever given access to the FD-302 report or made aware of its existence.

Because of the errors in the presentence report, Jones argues that the Government did not carry its burden of proving that he distributed seven grams of crack cocaine to Johnson. In response, the Government claims that Jones waived the right to contest the amount of drugs attributable to him because "Jones did not make a specific objection to the valuation of the crack cocaine distributed to Johnson." Govt. Br. at 30-31. On the merits the Government claims that the presentence report "simply mischaracterized" Johnson's trial testimony and therefore Jones was properly sentenced. Id. at 31.

We agree with Jones that he did not waive the right to appeal the quantity of drugs attributable to him. We also believe that it was clear error for Jones to be sentenced based on allegations which were untrue and which he never had a fair opportunity to contest. However, on remand, we believe that the Government should again be allowed to establish that Jones distributed the additional seven grams to Johnson, provided that the Government relies exclusively upon evidence that was properly in the record at the time of Jones's first sentencing.

As for waiver, at the sentencing hearing Jones's counsel specifically objected to the presentence report's inclusion of the additional seven grams:

8

Relative to the additional 7 grams, Your Honor, that the government seeks to have you consider, that will be the O'Neal Johnson transaction. It's our position, Your Honor, that that particular quantity, whatever that quantity was, is unknown, that that was for his personal use. And as the defendant testified at the trial, at this party he put it up on the counter. He didn't give it to either O'Neal Johnson or the others. They took it. He never got any money for it. It was for his own personal use.

But as far as the quantity, it's too speculative as to how much --

The district court then injected a comment, and the prosecutor responded to defense counsel's argument, claiming that Johnson estimated the value of the crack cocaine provided by Jones at the party to be $400. Clearly, therefore, Jones's counsel called the district court's attention to the fact that the presentence report's estimate of the amount of drugs attributable to Jones was speculative and not supported by the record. See United States v. Terry , 916 F.2d 157, 162 (4th Cir. 1990) (a defendant that contests the findings in a presentence report "has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate").

On the merits, we hold that the presentence report's reliance upon mischaracterized information from the FD-302 report, which Jones's counsel did not know about and had no opportunity to contest, requires that Jones's sentence be vacated and the case remanded for resentencing. See Inglesi, 988 F.2d at 502 (due process may be violated in sentencing by use of inaccurate information and due process may also be violated when sentencing is based on information the defendant has not had a fair opportunity challenge); Headspeth, 852 F.2d at 755 (a convicted defendant retains a due process right not to be sentenced based on materially false or inaccurate information).

Our decision to vacate and remand is not, however, predicated on the fact that the additional seven grams--if that quantity is established by the record at resentencing--falls outside of "relevant conduct" under section 1B1.3. At resentencing the district court might decide

9

that Johnson's testimony at trial was sufficient to establish the additional seven grams. The district court, however, might also reach the opposite conclusion. But in any event, the district court should have the opportunity to sentence Jones without having to rely upon a concededly inaccurate presentence report.

Accordingly, if at resentencing the Government is able to establish by a preponderance of the evidence that Jones distributed the additional seven grams to Johnson, then Jones's sentence may be based on twenty-one grams. The Government may not, however, go outside of the existing record to establish the distribution of the additional seven grams, and, in particular, the Government may not rely upon the FBI FD-302 report. See United States v. Parker, 30 F.3d 542, 553-54 (4th Cir.) (at resentencing government may not go outside of the existing record and introduce new evidence to support imposition of enhanced sentence), cert. denied, 115 S. Ct. 605 (1994).[6]

IV.

Jones's conviction is affirmed, but his sentence is vacated and the case is remanded for resentencing in a manner consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

_____

[6] Our mandate on resentencing is thus limited to whether the Government can establish that there is in fact an additional seven grams (or some lesser amount) attributable to Jones as "relevant conduct" under section 1B1.3 of the Sentencing Guidelines. Whether Jones is resentenced based on 14 grams, 21 grams, or some number in between, the actual sentence imposed is "constrained only by the constitutional bar against vindictiveness, North Carolina v. Pearce, 395 U.S. 711 (1969), the controlling statutes, and the Sentencing Guidelines." United States v. Broughton-Jones, 71 F.3d 1143, 1149 n.4 (4th Cir. 1995); see United States v. Bell, 5 F.3d 64, 67 (4th Cir. 1993).