**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                      No. 98-4000

ROBERT M. CLEMENTS, JR.,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                      No. 98-4001

THOMAS TURBEVILLE,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                      No. 98-4041

ERNEST MICHAEL JONES,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr. and William B. Traxler, Jr.,
District Judges.
(CR-96-480, CR-97-133)

Argued: December 4, 1998

Decided: January 14, 1999

Before WILKINSON, Chief Judge, KING, Circuit Judge, and
WILLIAMS, United States District Judge
for the District of Maryland,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Russell Doyle Ghent, LEATHERWOOD, WALKER,
TODD & MANN, P.C., Greenville, South Carolina, for Appellants.
David Calhoun Stephens, Assistant United States Attorney, Green-
ville, South Carolina, for Appellee. **ON BRIEF:** Chad A. McGowan,
MCGOWAN LAW FIRM, Atlanta, Georgia, for Appellant Clements;
Edward M. Saufain, Greenville, South Carolina, for Appellant Jones.
J. Rene Josey, United States Attorney, Greenville, South Carolina, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Robert M. Clements, Jr. and Thomas Turbeville appeal their con-
victions on multiple counts of wire fraud under 18 U.S.C. § 1343,
alleging that the district court abused its discretion by failing to sever
their trials from those of other codefendants, and that it erred in deny-
ing their motions to suppress certain evidence. Clements and Tur-
beville also allege multiple evidentiary, procedural, and sentencing
errors. Finally, Clements, Turbeville, and codefendant Ernest Michael
Jones--who pleaded guilty to wire fraud--argue that the district court

2

improperly enhanced their sentences because, in the district court's opinion, they had chosen "vulnerable victims." U.S. Sentencing Guidelines Manual § 3A1.1(b) (1997) (hereinafter U.S.S.G.). We hold that each of the district court's rulings of which appellants complain was proper, and, as a result, we affirm the convictions and sentences appealed.

I.

In the late 1980s, Kashma Porter began a telemarketing operation in Atlanta, Georgia, called CD Marketing ("CDM"). Sometime in 1994, Clements came to work as a telephone solicitor for CDM, and Turbeville began work in the same capacity approximately six months later.

CDM's "business" consisted of telephoning individuals whose names appeared on "lead sheets" that were provided by CDM's co-owner, Reginald Jennings. The telephone solicitors would contact individuals on the lead sheets and inform them that they had been selected to receive large cash prizes, but that they needed to send cash to CDM in order to "qualify" for the prizes. Some of the contacted individuals would respond by sending varying amounts of cash to CDM, usually between $1000 and $2000, as requested by the solicitors. See J.A. 332. In some cases, CDM would then send low-value merchandise to responding individuals (i.e., their victims); these goods included small safes, "household items," and "trinkets." J.A. 333.

Contrary to what the solicitors had told them, the people contacted had not been selected to receive any "top bonus prizes." Instead, their names and phone numbers had simply appeared on the lists obtained by Jennings. The overwhelming majority of the people contacted were elderly, and, at trial, witnesses testified that these victims had been selected because of their age. E.g., J.A. 324, 778. Many victims who had sent in money to one of Porter's companies in the past--thereby demonstrating themselves to be, in one solicitor's words, "proven buyer[s]"--were contacted repeatedly. Such victims were referred to as "reloads." Id.

Clements, Turbeville, and Jones made phone calls like those described above. When making such calls, each used an alias. Tur-

3

beville used the alias "John Wilson," and Clements identified himself as "Bobby Boyd." J.A. 331. One fellow solicitor explained that the aliases were used to prevent reloads from identifying solicitors that had previously called them. J.A. 330.

In 1995, Porter was sued by the Georgia Department of Consumer Affairs. As a result of that litigation, he entered into a consent decree under which he agreed to close down CDM and pay restitution to its victims. Porter later testified that he provided copies of the consent decree to all of CDM's employees, including Clements and Turbeville. J.A. 780.

While he was negotiating the consent decree in Georgia, Porter began setting up a nearly identical operation in Greenville, South Carolina, under the name of Initial Services. After CDM was shut down, both Clements and Turbeville came to work as telephone solicitors for Initial Services. The company operated from a single, two-bedroom apartment in which multiple phone lines had been installed. Ordinarily, all solicitors would make their calls over speaker phones, so that they could easily overhear each others' conversations. J.A. 338, 784-85. As Porter would later testify, "[I]f you were in the apartment, it was quite difficult for you not to hear." J.A. 786. The speaker phones also allowed the solicitors to coach each other through particularly difficult conversations. One of the solicitors testified at trial that he had personally coached Turbeville. J.A. 339.

During the six months of 1995 when it operated out of Greenville, Initial Services collected approximately $500,000 from its victims. J.A. 707. Worried that he would soon experience the same problems he had encountered in Georgia, Porter decided to close Initial Services's Greenville office and to re-establish the company near Chattanooga, Tennessee. The new company was called Safe Health Products ("SHP"), and it employed both Clements and Turbeville. In preparing to commence its operations, SHP opened an account at AmSouth Bank and rented a drop box at Mail Boxes Etc in Chattanooga.

In January 1996, Special Agent Earl Burns of the F.B.I., who headed a taskforce on telemarketing fraud, received word from AmSouth Bank that SHP's account showed signs of being used in an illegal telemarketing operation. Specifically, a large number of out-of-

4

state checks were being deposited into the account, and many of those checks were being dishonored and returned to the bank. Near the same time, Burns learned that complaints had been filed against SHP in the F.B.I.'s Charlottesville, Virginia office. Id. The complainant had identified SHP's address at Mail Boxes Etc near Chattanooga.

On January 19, 1996, Burns contacted the Mail Boxes Etc branch that SHP was using. In response to Burns's questions, Mail Boxes Etc explained that SHP's mail ordinarily consisted of thin Federal Express envelopes, and that one of these envelopes showed the return address of the original complainant in Virginia. Using their return addresses and phone numbers--which appeared on the outside of the Federal Express envelopes--Burns contacted several of the people who had sent packages to SHP. All of the senders Burns spoke to were elderly, each had been told by SHP that he or she had won a prize, and each had sent a check for between $1000 and $2000 to SHP to "qualify" for this prize. J.A. 218.

Burns and other federal agents then went to the Mail Boxes Etc in Chattanooga, Tennessee, where they met Reginald Brown, who had come to retrieve SHP's mail. Id. As Burns examined Brown's driver's license, Brown volunteered that his license had been suspended. J.A. 220. When Burns informed Brown that Brown would not be permitted to operate the car that he had driven to Mail Boxes Etc, Brown telephoned SHP's apartment. Jones and Turbeville soon arrived to pick up Brown. J.A. 220.

Burns identified himself to Jones and Turbeville and asked if they would show him SHP's apartment. The pair consented, and Burns and the other agents followed them to the apartment. J.A. 221-22. Jones, Turbeville, or Brown opened the door and allowed Burns and the other agents to enter the apartment. J.A. 222-23. Once inside, Burns immediately saw several telephones, tape recorders, lead sheets, a fax machine, and several opened Federal Express packages. J.A. 223. Based on his experience with telemarketing fraud, Burns recognized that the apartment was probably a "boiler room" for a telemarketing operation, and that, in his opinion, it could be dismantled in five to ten minutes. Clements and Porter, among others, were present in the apartment when Burns arrived. J.A. 226.

5

Burns then contacted an Assistant United States Attorney ("AUSA") to request assistance in conducting a lawful search of the apartment and a seizure of any evidence there. J.A. 224. At the AUSA's instruction, Burns asked if Porter--whom Burns had been told was the leader of the operation--would consent to a search of the apartment. J.A. 225. Porter did not immediately consent, but after Burns began preparing the affidavit necessary to obtain a warrant, Porter signed a written consent allowing Burns to search the apartment. J.A. 226.

Burns and the other agents then searched the apartment. During their search they found lead sheets in various rooms, handwritten sales logs, handwritten summaries of payments made to solicitors, tape recordings of various solicitors' phone calls, and other documents relating to the company's operations in both Tennessee and South Carolina. See J.A. 227-28.

Based on this and other information, including the company's banking records from South Carolina, a federal grand jury in Greenville, South Carolina, indicted Porter, Clements, Turbeville, Jones, Brown, Jennings, and Gary Becks. J.A. 55-67 (original and superseding indictments). The superseding indictment charged each defendant with sixteen counts of committing wire fraud, in violation of 18 U.S.C. § 1343. J.A. 66. Each count was predicated on a single, separate phone call made from the offices of Initial Services in Greenville between July and November, 1995, a period during which both Clements and Turbeville worked for the company.

Clements and Turbeville each filed motions to sever their trials from those of the other defendants and to suppress all evidence recovered during the search of the Chattanooga apartment. The district court denied those motions. J.A. 132, 306. Before trial, defendants Jones, Becks, and Brown entered guilty pleas, leaving Porter, Jennings, Turbeville, and Clements to be tried jointly.

At trial in Greenville, South Carolina, in late 1996, the Government presented the documentary evidence and tapes of phone calls that had been seized in Tennessee. The sales logs, along with testimony of certain victims, indicated that some of the phone calls listed in the superseding indictment had been made by Clements, and others by

6

Turbeville. E.g., J.A. 720-21. Becks also testified for the Government. He detailed the day-to-day aspects of the company and confirmed that he had known that the operation was fraudulent. J.A. 333.

After the Government rested its case, defendants Porter and Jennings pleaded guilty, leaving only Clements and Turbeville as active defendants. J.A. 767. The Government then immediately moved to reopen its case, so that it could call Porter as an additional witness. J.A. 768. The district court granted the Government's motion over objections from Clements and Turbeville. Id. Porter then testified as to the remaining defendants' involvement in his operation, and he confirmed that the Government's case had accurately portrayed the nature of the telemarketing scheme. J.A. 791. Porter further acknowledged that the group had targeted the elderly. J.A. 778.

In response to Porter's strong testimony, both Clements and Turbeville testified in their defense. Each of them denied knowing that the operation had been fraudulent, and each denied that he had intended to defraud anyone he had called. J.A. 841, 921.

At the close of the trial, the jury found Turbeville guilty on Counts II and VII of the superseding indictment, and it convicted Clements on Counts II, III, and VIII. J.A. 1021. The parties agree that specific record evidence indicated that each of these defendants had actually been involved in each phone call that formed the basis for the counts of which he was convicted. Both defendants were acquitted on all other counts.

At sentencing, the district court determined that the amount of loss for which Clements and Turbeville each were responsible exceeded $500,000. The court further enhanced their sentences on the grounds that each had (a) obstructed justice by committing perjury on the witness stand, U.S.S.G. § 3C1.1; and (b) undertaken "more than minimal planning", U.S.S.G. § 2F1.1(2). The court also declined to reduce Clements's and Turbeville's sentences on the grounds that they were minor participants in the scheme, as defined by U.S.S.G. § 3B1.2(b). J.A. 1200. Finally, the district court enhanced the sentences of Clements, Turbeville, and Jones for having chosen victims that were vulnerable because of their advanced ages, U.S.S.G.§ 3A1.1(b). As a result of these adjustments, the district court sentenced Clements to

7

sixty months of imprisonment, Turbeville to forty-seven months, and Jones to thirty-eight months. Clements and Turbeville appeal their convictions, and along with Jones, appeal the sentences they received.

II.

Clements and Turbeville challenge the district court's denial of their severance motions, as well as its refusal to suppress the evidence seized during the search of the apartment. They also challenge the court's decision to permit the Government to reopen its case after Porter had pleaded guilty, as well as certain of the court's evidentiary and procedural rulings.

With regard to their sentences, Clements and Turbeville maintain, among other things, that the district court erroneously enhanced their sentences based on its determination that they had committed perjury. Finally, Clements, Turbeville, and Jones all assert that the district court abused its discretion in applying the "vulnerable victim" enhancement to each of their sentences.

A.

Clements and Turbeville argue that the district court erred in denying their motions to be tried separately from the other defendants. First, they argue that the overwhelming evidence of their codefendants' guilt prevented the jury from making individualized determinations with respect to their individual criminal intent, or lack thereof. Second, they allege that, because the jury must have viewed them as being "in the same boat" as their codefendant, Kashma Porter, they were unduly prejudiced when Porter later testified against them. In essence, they believe that the jury must necessarily have taken their codefendant's on-stand confession as an implicit acknowledgment of their own guilt. We disagree.

1.

Rule 8(b) of the Federal Rules of Criminal Procedure permits the joint trial of defendants that have been named in the same indictment "if they are alleged to have participated in the same . . . series of acts

8

or transactions constituting an offense or offenses." The Supreme Court has emphasized that the federal system of criminal justice promotes and supports the joint trial of defendants who are indicted together. Zafiro v. United States, 506 U.S. 534, 536 (1993) ("Joint trials `play a vital role in the criminal justice system.'" (quoting Richardson v. Marsh, 481 U.S. 200, 209 (1987))). Nevertheless, a district court may sever the trials of codefendants "[i]f it appears that a defendant . . . is prejudiced by a joinder of . . . defendants . . . for trial together." Fed. R. Crim. P. 14. We review a district court's denial of a motion for severance for abuse of discretion. Zafiro, 506 U.S. at 538-39.

In Zafiro, the Supreme Court explained that severance is mandated "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. Here, Clements and Turbeville first invoke one of the specific grounds for prejudice listed in Zafiro: They assert that they were unfairly prejudiced by the jurors' consideration of evidence regarding their codefendants' actions that, absent a joint trial, would not have been admissible against them. See id.

While the appellants fail to specify exactly which pieces of evidence would have been inadmissible against them in a separate proceeding, we are convinced that the evidence relating to their codefendants' actions did not prevent the jury from fairly deciding their cases. The strongest indication that the jury carefully sorted through the entirety of the evidence is that Clements and Turbeville were each convicted only of those counts of the superseding indictment that were based on telephone calls which, according to the record, he had made himself. Consequently, it is manifest that any evidence of codefendants' actions, whether or not admissible as to Clements or Turbeville, did not prevent the jury from fairly evaluating the ultimate question of these appellants' guilt or innocence.

2.

Clements and Turbeville complain that Porter's mid-trial decision to plead guilty, together with his ensuing testimony on behalf of the Government, necessarily caused the jury to convict them solely

9

because of their association with Porter. Put differently, they believe they were convicted because Porter, who had previously been their codefendant and "in the same boat" with them, admitted his own guilt.

We have no doubt that Porter's guilty plea and testimony dealt a serious strategic blow to Clements's and Turbeville's defenses. However, the Supreme Court has clearly rejected the idea that trials must be severed to prevent admission of potentially damaging testimony from codefendants:

> A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.

Zafiro, 506 U.S. at 540. Also, even before Porter chose to testify, the jury had already heard extensive and damning testimony from Gary Becks, who, like Porter, had been indicted with Clements and Turbeville. Becks also testified that he had pleaded guilty. J.A. 356.

Accordingly, we conclude that Porter's decision to plead guilty and to give "relevant and competent" testimony for the Government did not prejudice Clements's or Turbeville's trial rights, and that the district court was thus well within its discretion to try both Clements and Turbeville together with their codefendants.

B.

Clements and Turbeville next argue that the district court improperly admitted the evidence seized during the search of the Chattanooga apartment. More specifically, they maintain that the district court erred in finding that the F.B.I.'s warrantless search of the apartment was justified by exigent circumstances. We reject this argument.

Warrantless entries into a dwelling place are presumed unreasonable. United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981). But we have recognized that warrantless entries may be justified when

10

they are made under certain "exigent circumstances." Id. Such circumstances exist when agents "have probable cause to believe that evidence of illegal activity is present and reasonably believe that it may be destroyed or removed before they can secure a warrant." United States v. Campbell, 945 F.2d 713, 715 (4th Cir. 1991). Where, as here, a district court has found the existence of exigent circumstances justifying a warrantless search, we will not overturn that finding of fact unless it is clearly erroneous. Turner, 650 F.2d at 528. However, we review de novo any legal conclusions in the district court's suppression ruling. United States v. McDonald, 61 F.3d 248, 254 (4th Cir. 1995).

In Turner, we identified five factors that should guide a determination of whether exigent circumstances exist in a particular case:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

Id. In its written order on this issue, the district court found that each of these five factors was, to a greater or lesser extent, present in this case.

We agree with the district court's assessment of these factors, and it is clear that the second, fourth, and fifth factors were especially strong here. There is no question that, at the moment Burns and his colleagues entered the Chattanooga apartment, everyone present knew that the "police [were] on their trail." Further, Burns testified at the hearing on the suppression motion that, based on his experience with telemarketing operations, it would have taken only five to ten minutes to dismantle the entire "boiler room" and to remove all relevant documents. J.A. 221. Finally, it is reasonable to assume that, if given the chance, the six suspects in the apartment would readily have "removed or destroyed" the evidence of their activities. With respect to this factor, we have held that the Government need not produce "concrete proof" that evidence was about to be destroyed; it simply must

11

show that a reasonable agent would have believed that the dwelling's occupants would attempt to destroy evidence before the agents could return with a warrant. United States v. Grissett , 925 F.2d 776, 778 (4th Cir. 1991).

In light of the strong presence of the factors discussed above, we cannot say that the district court clearly erred in finding that exigent circumstances justified the F.B.I.'s warrantless search of the apartment. As a result, the district court properly denied Clements's and Turbeville's motions to suppress the fruits of that search.

C.

The next issue raised by Clements and Turbeville is whether the district court erred in permitting the Government to reopen its case and call Porter as a witness, all after the Government had rested. We conclude that, however damaging Porter's testimony may have been to his former codefendants, it was not error for the district court to allow the Government to reopen its case.

The decision of whether to reopen a case after the close of the evidence is committed to the district court's discretion. United States v. Abbas, 74 F.3d 506, 510 (4th Cir. 1996). In exercising that discretion, the trial court is guided by three practical factors:

> (1) whether the party moving to reopen provided a reasonable explanation for failing to present the evidence in its case-in-chief; (2) whether the evidence was relevant, admissible, or helpful to the jury; and (3) whether reopening the case would have infused the evidence with distorted importance, prejudiced the opposing party's case, or precluded the opposing party from meeting the evidence.

Id. at 510-11. In this case, there is no question that the first factor weighed heavily in favor of permitting the Government to reopen its case: Porter's Fifth Amendment rights had prevented the Government from calling him during its case-in-chief. There is also little doubt that Porter's detailed testimony regarding the day-to-day operations of the telemarketing company was relevant and helpful to the jury, and neither Clements nor Turbeville objected to its admissibility.

12

The district court also correctly applied the third factor. While Porter's mid-trial decision to plead guilty and testify for the Government must certainly have gotten the jury's attention, we do not believe it was thereby imbued with "distorted importance." Cf. United States v. Peay, 972 F.2d 71, 73 (4th Cir. 1992) (testimony directly contradicting defendant's denial of guilt not given distorted importance even when presented immediately before summation). As the apparent ringleader of the operation, Porter's testimony would have been important whenever it was given. Here, it was given before the defendants' case-in-chief had begun; thus, Clements and Turbeville were given an opportunity to meet any additional evidence Porter offered in his testimony.

Under these circumstances the district court was well within its discretion in permitting the Government to reopen its case after it had rested.**1**

III.

Clements and Turbeville also argue that the district court erred in enhancing their sentences under U.S.S.G. § 3C1.1, based on its finding that each of them committed perjury when testifying at trial. Specifically, they argue that the district court failed to make particularized findings regarding each element of perjury, as required by United States v. Dunnigan, 507 U.S. 87 (1993). Before a defendant's sentence may be enhanced for perjury, Dunnigan requires the district court to find "that the defendant's testimony was untruthful as to a material matter, and that the false testimony was willful." United States v. Queen, 132 F.3d 991, 1000 (4th Cir. 1997) (citing Dunnigan, 507 U.S. at 94-95)). While it is "preferable" for a district court to make a separate, clear finding as to each element of perjury, its findings are sufficient whenever it finds all three elements. Id.

_____

**1** Clements and Turbeville raise several additional evidentiary and procedural issues. For example, they argue that certain admitted evidence was inadmissible hearsay as to them, that other evidence was improperly admitted under Rule 404(b), and that the district court erred in denying their motions for acquittal. We have carefully considered the appellants' arguments as to each of these issues and find that they are each without merit.

With respect to Clements, the district court specifically found that he had testified falsely, that the testimony had related to a material issue, and that the testimony constituted "a willful attempt to obstruct justice." J.A. 1180. Likewise, the district court found all three elements present in Turbeville's testimony. J.A. 1185-86. Accordingly, the district court's findings satisfied the <u>Dunnigan</u> test as to each defendant's testimony, and its enhancement under U.S.S.G. § 3C1.1 was therefore appropriate as to the sentences of Clements and Turbeville.**2**

IV.

Jones's sole argument on appeal is that the district court erred in enhancing his sentence under U.S.S.G. § 3A1.1(b), which permits a two-point increase in the base offense level when a defendant has chosen his or her victims because they were vulnerable due to age. <u>See</u> U.S.S.G. § 3A1.1(b). Clements and Turbeville raise the same argument with respect to the enhancement of their own sentences. J.A. 1174. Since the record well supports the district court's findings with respect to this issue, this argument is also rejected.

Importantly, both Porter and Becks testified that their operation had targeted elderly victims. J.A. 778, 1162. Further, the Government had surveyed all of the apparent victims of the defendants' scheme, and more than eighty-five percent of those who responded to the survey were over seventy years old. J.A. 1159. Finally, it is simply not believable that, after working in telemarketing for years, neither Clements, Turbeville, nor Jones could tell that the persons to whom they were speaking on the phone were most likely elderly. For these reasons, we hold that the district court was correct in enhancing the appellants' sentences pursuant to U.S.S.G. § 3A1.1(b).

_____

**2** Clements and Turbeville also challenge their sentences based on the (1) district court's finding as to the amount of loss involved in the offenses of conviction, (2) its finding that both of them had engaged in more than minimal planning, and (3) its failure to depart downward because they were "minor participants" under U.S.S.G. § 3B1.2. We have reviewed these arguments with respect to both Clements and Turbeville, and we conclude that each of them is meritless.

V.

Pursuant to the foregoing, each of the appealed convictions and sentences is hereby

AFFIRMED.

15