**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.
                                          No. 96-4638
PATRICK ELIE a/k/a Patrick Gerald
Elie, a/k/a Marie Patrick Elie,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CR-96-203)

Argued: January 28, 1997

Decided: April 24, 1997

Before HALL, LUTTIG, and WILLIAMS,
Circuit Judges.

_____

Reversed by published opinion. Judge Williams wrote the majority
opinion, in which Judge Luttig joined. Judge Hall wrote a
dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** Marcus John Davis, Assistant United States Attorney,
Alexandria, Virginia, for Appellant. Blair Gerard Brown, ZUCKER-
MAN, SPAEDER, GOLDSTEIN, TAYLOR & KOLKER, L.L.P.,
Washington, D.C., for Appellee. **ON BRIEF:** Helen F. Fahey, United

States Attorney, Vincent L. Gambale, Assistant United States Attorney, Alexandria, Virginia, for Appellant. Jonathan H. Levy, ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & KOLKER, L.L.P., Washington, D.C., for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Patrick Elie was indicted by a federal grand jury on two counts of making a false statement to a firearms dealer, see 18 U.S.C.A. §§ 922(a)(6), 924(a)(2) (West Supp. 1997), and on one count of impersonating an accredited diplomat, see 18 U.S.C.A. § 915 (West Supp. 1997). Shortly thereafter, Elie moved to suppress, among other things, the firearms and firearms receipts found in his hotel rooms, the firearms transaction records obtained from Gilbert Small Arms (the firearms dealer), and the testimony of the individual at Gilbert Small Arms who sold Elie the firearms. The district court, in a series of orders, suppressed the evidence as the "tainted fruit" of a Miranda violation. The district court also ruled that the warned and voluntary statements Elie made at the Arlington County Detention Center, in which he identified the firearms seized from his hotel rooms and the firearms dealer that sold him the weapons, did not constitute an "independent source" for admitting any of the challenged evidence. Finding that the "fruit of the poisonous tree" analysis is inapplicable in cases involving mere departures from Miranda, we reverse.

I.

Based on a complaint that Patrick Elie, a former cabinet member in the United States-supported Haitian government led by Jean-Baptist Aristide, had assaulted Ms. Raymonde Preval-Belot, First Secretary of the Haitian Embassy in Washington, D.C. and sister of the current Haitian President, a warrant was issued for his arrest. The affidavit in support of the arrest warrant stated that Elie possessed firearms and that he also had threatened to harm, among other people, the Haitian Ambassador to the United States.

2

On April 23, 1996, several Fairfax County police officers and two State Department Diplomatic Security Service agents (the officers) went to the Hunter Hotel in Springfield, Virginia to arrest Elie, who was "considered armed and dangerous." Two officers, with guns drawn, confronted Elie in the hotel restaurant. Elie was ordered to the ground, handcuffed, and searched for weapons.[1] After being helped to his feet, and prior to any police questioning, Elie stated that he was a diplomat.

Elie was then escorted out of the dining area and into the hotel lobby, where he was asked, prior to receiving any Miranda warnings, whether he had any weapons in his hotel rooms. After responding in the affirmative, Elie was told that he had the option of having the weapons and his other possessions secured by either hotel manage-ment or the police. Elie elected to have the officers secure and inven-tory his property.

Elie accompanied the officers to his rooms. In addition to observ-ing the inventory search from just outside the rooms, Elie reportedly "spoke non-stop" during the encounter. Among other things, he (1)told the officers where they could find certain items, including weapons; (2)revoked his consent to search a container that contained a number of documents; and (3)asked the officers why he had not been given his Miranda warnings.[2]

As a result of the search, the officers secured a Colt .223 semi-automatic assault rifle with a round in the chamber and six magazines loaded with armor piercing ammunition; a Remington .22 caliber bolt action rifle equipped with a telescopic sight; a loaded Steyr 9mm semi-automatic pistol and 264 9mm rounds, including 180 rounds of hollow-point ammunition; night vision equipment; two knives; approximately $4,800 in cash; purchase receipts for three additional firearms; and documents relating to, among other things, the activities of the Haitian Ambassador.

_____

[1] Although the search did not produce any weapons, the officers did find keys to two hotel rooms.
[2] Despite his inquiry, Elie was not read his Miranda rights until after arriving at the Arlington County Detention Center for processing on the assault charges.

After Elie's property was secured, he was taken to the Arlington Detention Center for processing on the assault charges. Arlington Detective Lee Ann Petta gave Elie a routine personal history form to complete. Elie wrote his name on the front of the form and, unsolicited, provided an account of his arrest on the back of the form. With a tape recorder running, Elie was given his <u>Miranda</u> warnings, signed an advice-of-rights form, and was asked if he would like to answer questions about the assault charges.

In response to Detective Petta's questions, Elie stated that he wished to ask some questions of his own. Elie, completely unsolicited, then proceeded to tell Detective Petta that he was in the United States conducting an undercover investigation of the Haitian Ambassador. In particular, he was investigating allegations that the Haitian Ambassador had embezzled millions in state funds, provided Haitian passports to terrorists and drug dealers, and plotted to assassinate both ex-president Aristide and President Preval.

Elie also told Detective Petta, without any prompting, about "the guns." After Detective Petta asked him to what he was referring, Elie identified the two rifles and the handgun seized from his hotel rooms. Later in the interview, again without any prompting by Detective Petta, Elie volunteered that he had purchased the firearms at Gilbert Small Arms.

While Elie was detained at the Arlington County Detention Center on the assault charges, State Department Diplomatic Security Service agents (DSS agents) interviewed the employees of Gilbert Small Arms and reviewed the firearms transaction records related to the sale of the aforementioned firearms. As a result of their investigation, the DSS agents believed that Elie knowingly made a false statement, both to the firearms dealer and on the firearms transaction records, with respect to facts material to the lawfulness of the sale of the weapons. Specifically, Elie stated that he resided at 2500 Clarendon Boulevard, Arlington, Virginia; a claim the DSS agents believed to be false.**3**

_____

**3** DSS agents believed Elie's claim to be false for several reasons. First, the firearm transaction records discovered at Gilbert Small Arms revealed that the weapons found in Elie's hotelrooms were purchased

4

Thereafter, based on a DSS agent's affidavit that Elie made a false
statement to a firearms dealer, a federal warrant was issued for his
arrest.

On April 29, 1996, two DSS agents arrived at the Arlington County
Detention Center to execute the federal arrest warrant. However,
before Elie was released into their custody, an official at the Arlington
County Detention Center asked him several routine discharge ques-
tions. Of particular importance in this case, Elie stated, both orally
and in writing, that he was a resident of "Port Au Prince."

Although DSS agents read him his <u>Miranda</u> warnings as they
placed him under arrest, Elie refused to sign the form acknowledging
or waiving his rights. Notwithstanding his refusal, Elie engaged the
DSS agents in conversation while they were en route to the location
where Elie would be processed on the firearms charges. Elie told the
DSS agents, among other things, that there was a"cancer" in both the
Haitian police force and the Haitian Embassy in Washington, D.C.,
that he was conducting an undercover investigation of the Haitian
Ambassador, and that he kept weapons in his hotel rooms to defend
himself in case the people whom he was investigating tried to assassi-
nate him.

_____

between March 30, 1996 and April 17, 1996. However, after searching
the electronic indices of the Treasury Enforcement Communications Sys-
tem, DSS agents determined that Elie had entered the United States most
recently on March 26, 1996. Prior to March 26, 1996, Elie had last
entered the United States on November 9, 1994 and departed on Novem-
ber 22, 1994. Although a search of the electronic indices of the Non-
Immigrant Information System of the Immigration and Naturalization
Service (INS) did not reflect Elie's entry on March 26, 1996, it did con-
firm that Elie entered the United States on November 9, 1994 and
departed on November 22, 1994. Second, Ms. Raymonde Preval-Belot,
the woman Elie allegedly assaulted, lived at the address that Elie gave
to Gilbert Small Arms. Ms. Preval-Belot confirmed that Elie did not live
at that address. Third, the general manager of the apartment complex

located at that address stated that Elie did not live there. Fourth, DSS agents obtained documentation that Elie was registered at the Quality Hotel when he made his first firearms purchase at Gilbert Small Arms.

5

Elie was subsequently indicted by a federal grand jury on two counts of making a false statement to a firearms dealer, see 18 U.S.C.A. §§ 922(a)(6), 924(a)(2), and on one count of impersonating an accredited diplomat, see 18 U.S.C.A.§ 915. Thereafter, Elie moved to suppress (1)his statement that he was a diplomat; (2)his statement acknowledging that there were firearms in his hotel rooms; (3)all the tangible evidence, including the firearms and firearms receipts, found in his hotel rooms; (4)his written statements on the back of the personal history form; (5)the statements he made to Detective Petta; (6)his written statement concerning his residency; and (7)the statements he made to the DSS agents.

After an evidentiary hearing on Elie's motion, the district court (1)denied suppression of Elie's statement that he was a diplomat, finding that the statement was not made in response to any police interrogation; (2)suppressed Elie's statement that he had weapons in his hotel rooms, finding that the statement was made while he was in police custody, in response to police interrogation, and without the necessary Miranda warnings; (3)suppressed all the tangible evidence found in Elie's hotel rooms, including the firearms and firearms receipts, finding that the evidence was the "tainted fruit" of the Miranda violation; (4)denied suppression of Elie's written statements regarding his arrest and his residency, finding that the statements were made in response to routine booking questions and, therefore, not given Fifth Amendment protection; and (5)denied suppression of Elie's warned statements to Detective Petta and the DSS agents, finding that he had waived his Miranda rights.

In assessing whether Elie had voluntarily, knowingly, and intelligently waived his Miranda rights, the district court examined the totality of the surrounding circumstances, which included the defendant's age, education, intelligence, and familiarity with the criminal justice system. Specifically, the district court found that Elie was forty-six years old, was well educated with an advanced degree in chemistry, spoke fluent English, and was familiar with the criminal justice system and its consequences.

Shortly thereafter, Elie filed a motion in limine to suppress the firearms transaction records related to the sale of the weapons found in his hotel rooms and the testimony of the individual at Gilbert Small

Arms who sold him the weapons. Reasoning that the Government identified Gilbert Small Arms from the firearms receipts obtained during the unlawful search of Elie's hotel rooms, the district court held that any evidence obtained from Gilbert Small Arms must also be the "tainted fruit" of the Miranda violation.

The Government, however, argued that Elie's warned and voluntary statements to Detective Petta, in which he identified the weapons seized from his hotel rooms and the firearms dealer that sold him the weapons, constituted an "independent source" for admitting the evidence obtained from Gilbert Small Arms -- the firearms transaction records and the testimony of the individual who sold him the firearms. Although noting that Elie voluntarily waived his Miranda rights before Detective Petta, the district court reasoned that that was not sufficient "to break the causal connection between the illegality of the search and seizure and [Elie's] responses to Detective Petta's questions which unduly exploited the Fourth Amendment violation." (J.A. at 39.) As a result, the district court concluded that Elie's statements to Detective Petta did not constitute an "independent source" for admitting the evidence obtained from Gilbert Small Arms. Accordingly, the district court suppressed both the firearms transaction reports and the testimony of the individual who sold Elie the firearms. This appeal followed.

II.

On appeal, the Government does not contend that the district court erred in suppressing the statements Elie made prior to receiving his Miranda warnings.[4] Rather, the Government argues that the district court erred in suppressing the firearms and firearms receipts found in Elie's hotel rooms, the firearms transaction records obtained from Gilbert Small Arms, and the testimony of the individual at Gilbert Small Arms who sold Elie the firearms. The Government contends, specifically, that the district court erred in applying the "fruit of the

_____

[4] Specifically, the Government does not appeal the suppression of Elie's statement that he had weapons in his hotel rooms.

7

poisonous tree" doctrine to the challenged evidence in this case. For
the reasons that follow, we agree.**5**

In reviewing the district court's suppression rulings, the evidence
must be construed in the light most favorable to Elie. See United
States v. Han, 74 F.3d 537, 540 (4th Cir. 1996) (noting that the evi-
dence must be construed in the manner most favorable to the prevail-
ing party below). We review the district court's legal conclusions de
novo. See United States v. McDonald, 61 F.3d 248, 254 (4th Cir.
1995). As a result, we review the district court's application of the
"fruit of the poisonous tree" doctrine de novo.

A.

In suppression cases, the challenged evidence is usually "direct" in
its "relationship to the prior arrest, search,[or] interrogation." Wayne
R. LaFave & Jerald H. Israel, Criminal Procedure§ 9.3(a), at 734
(1984). Examples of this type of evidence include statements made in
response to police questioning, such as Elie's statement that he had
weapons in his hotel rooms, and physical evidence found as a result
of a search or arrest. If the arrest, search, or interrogation was unlaw-
ful, the direct evidence, absent an exception to the exclusionary rule,
must be suppressed.

In other cases, however, the challenged evidence is"derivative" in
character. See id. Examples of this type of evidence include physical
evidence discovered as a result of a statement made in response to
police questioning, such as the firearms and firearms receipts found
in Elie's hotel rooms, and a witness discovered as a result of physical

_____
**5** In the alternative, the Government contends that the district court
erred in finding that Elie's warned and voluntary statements to Detective
Petta did not constitute an "independent source" for admitting both the
firearms transaction records and the testimony of the individual at Gilbert
Small Arms who sold Elie the firearms. Because we find that the

district
court erred in its application of the "fruit of the poisonous tree" doctrine,
we need not, and do not, address whether the district court also erred in
its application of the "independent source" doctrine. See Karsten v. Kai-
ser Found. Health Plan, 36 F.3d 8, 11 (4th Cir. 1994) (per curiam) (not-
ing that alternative holdings should be avoided).

8

evidence found during a search or arrest. If the arrest, search, or inter-
rogation is later held to be unlawful and thus requires the suppression
of the direct evidence, the derivative evidence must also be sup-
pressed in certain circumstances. Specifically, derivative evidence
must be suppressed when, as Justice Frankfurter explained, it is the
"fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338,
341 (1939).

With that background, our analysis begins with the seminal case of
Wong Sun v. United States, 371 U.S. 471 (1963), in which the
Supreme Court explicitly articulated the "fruit of the poisonous tree"
doctrine.**6** According to the Wong Sun majority, derivative evidence,
such as physical evidence, a confession, or the testimony of a witness,
is not "`fruit of the poisonous tree' simply because it would not have
come to light but for the illegal actions of the police." Id. at 488.
Rather, derivative evidence must be suppressed as"fruit of the poi-
sonous tree" if it was discovered by exploiting an illegal search. See
id.; see also Oregon v. Elstad, 470 U.S. 298, 305-06 (1985) (noting
that the "fruit of the poisonous tree" doctrine is drawn from Wong
Sun, where "the Court held that evidence and witnesses discovered as
a result of a search in violation of the Fourth Amendment must be
excluded from evidence" (emphasis added)). Consequently, if the
derivative evidence is discovered "by means sufficiently distinguish-
able [from the illegality] to be purged of the primary taint," Wong Sun
371 U.S. at 488, then it is admissible.

In Michigan v. Tucker, 417 U.S. 433 (1974), the Supreme Court
was asked to apply the "tainted fruits" doctrine to the testimony of a
witness whose identity was discovered as the result of a statement
obtained from the defendant in violation of Miranda. In declining to
extend the "tainted fruits" doctrine to the facts in Tucker, the Supreme
Court noted that the unwarned questioning did not abridge the defen-
dant's Fifth Amendment privilege, "but departed only from the pro-

---

**6** Although the doctrine traces its roots to the Supreme Court's decision
in Silverthorne Lumber Co. v. United States, 251 U.S. 385(1920),

and the
phrase itself was coined in <u>Nardone v. United States</u>, 308 U.S. 338
(1939), the doctrine took on its present form in <u>Wong Sun</u>. <u>See
Oregon
v. Elstad</u>, 470 U.S. 298, 305-06 (1985) (noting that the "fruit of
the poi-
sonous tree" doctrine is drawn from <u>Wong Sun</u> ).

9

phylactic standards later laid down by this court in <u>Miranda</u> to safeguard that privilege." <u>Id.</u> at 445-46. Because the defendant's constitutional rights were not infringed, the Court in <u>Tucker</u> determined that the "fruit of the poisonous tree" doctrine did not apply. <u>Id.</u> at 445 n.19. As a result, although the direct evidence (the defendant's unwarned statement) had to be suppressed, the derivative evidence (the testimony of the witness discovered as a result of the unwarned statement) was admissible. <u>Id.</u> at 445-46.

When presented with another opportunity to extend the "tainted fruits" doctrine, the Supreme Court in <u>Elstad</u> once again declined the invitation to do so. In <u>Elstad</u>, two officers went to the defendant's home with a warrant for his arrest. 470 U.S. at 300. After executing the warrant, the officers questioned Elstad about his role in the burglary of a neighbor's house. As a result of the interrogation, Elstad confessed to his involvement in the crime. <u>See id.</u> at 301. The defendant was then escorted to the police station where the officers advised him for the first time of his <u>Miranda</u> rights. After waiving his rights, the defendant once again confessed to the burglary. <u>See id.</u> Later, the defendant sought to suppress his second confession as the "fruit of the poisonous tree," arguing that it was obtained only as the result of his first confession that was made in violation of <u>Miranda</u>. <u>See id.</u> at 302.

The <u>Elstad</u> majority, however, held that the"tainted fruits" doctrine did not apply to the second confession for the same reasons the doctrine did not apply in <u>Tucker</u>. <u>See id.</u> at 308. Specifically, the Court held that "[s]ince there was no actual infringement of the suspect's <u>constitutional</u> rights, the case was not controlled by the doctrine expressed in <u>Wong Sun</u> that fruits of a <u>constitutional</u> violation must be suppressed." <u>Id.</u> (emphasis added). As a result, although the direct evidence (the defendant's first confession) had to be suppressed,

the
derivative evidence (the second confession that was obtained as a
result of the first confession) was admissible. <u>See id.</u> at 309.

Although the Supreme Court has not specifically rejected applica-
tion of the "fruit of the poisonous tree" doctrine to physical
evidence
discovered as the result of a statement obtained in violation of
<u>Miranda</u>,**7**

_____

**7** Prior to writing the majority opinion in <u>Elstad</u>, Justice O'Connor
argued against applying the "fruits of the poisonous tree" doctrine
to

10

it is clear to us that the Court's reasoning in <u>Tucker</u> and <u>Elstad</u> com-
pels that result.**8** <u>Accord United States v. Gonzalez-Sandoval</u>, 894 F.2d

_____

physical evidence discovered as the result of a statement obtained in vio-
lation of <u>Miranda</u>. <u>See New York v. Quarles</u>, 467 U.S. 649, 671 n.4
(1984) (O'Connor, J., concurring) ("<u>Wong Sun</u> is inapplicable in cases
involving mere departures from <u>Miranda</u>. <u>Wong Sun</u> and its `fruit of the
poisonous tree' analysis lead to exclusion of derivative evidence only
where the underlying police misconduct infringes a`core' constitutional
right."). In <u>Quarles</u>, a young woman told two police officers that she had
just been raped. After describing Quarles, the victim told the officers that
he had just entered a store located nearby and that he was carrying a gun.
After entering the store the officers quickly spotted a man fitting the
description of Quarles. After a short chase, Quarles was caught and
searched. Because he was wearing an empty shoulder holster, the arrest-
ing officer asked Quarles, prior to reading him his <u>Miranda</u> warnings,
where the gun was. <u>See id.</u> at 651-52. Quarles nodded in the direction of
some empty cartons and stated, "the gun is over there." <u>Id.</u> at 652. The
majority held that the state court had erred in suppressing Quarles's
statement and the gun. According to the Court, a statement made without
the necessary <u>Miranda</u> warnings is admissible if obtained under emer-
gency circumstances. <u>See id.</u> at 655-56. Justice O'Connor, however,
believed that the defendant's statement concerning the location of the
weapon should have been suppressed, but that the actual weapon should
have been admitted. <u>See id.</u> at 660 (noting that "nothing in <u>Miranda</u> or
the privilege itself requires exclusion of nontestimonial evidence derived
from informal custodial interrogation").
**8** In applying the "fruit of the poisonous tree" doctrine to the facts in
this case, the district court cited for support this Court's

decision in
United States v. Mobley, 40 F.3d 688 (4th Cir. 1994), cert. denied, 115
S. Ct. 2005 (1995). In Mobley, FBI special agents arrived at Mobley's
apartment with arrest and search warrants. Prior to executing the search
warrant, Mobley was asked, after he had invoked his right to speak to an
attorney, whether he had any weapons in his apartment. After stating that
there was a weapon in his bedroom closet, Mobley led the officers to it.
See id. at 690-91. Although agreeing that Mobley's answer to the
police's questioning regarding the presence of a gun should have been
suppressed, the Court held that the gun was admissible because discov-
ery of it was inevitable. See id. at 693 (noting that the police had a search
warrant for Mobley's apartment). In addition to so holding, the Mobley
Court mused that absent the search warrant, the gun obtained as a result
of the Miranda violation might be suppressed as "fruit of the poisonous

11

1043, 1048 (9th Cir. 1990) (finding that the "tainted fruits" doctrine does not apply to physical evidence obtained as a result of a <u>Miranda</u> violation); <u>see also</u> Wayne R. LaFave & Jerald H. Israel, Criminal Procedure § 9.5(b), at 201 (Supp. 1991) (noting that "<u>Elstad</u> only rejected application of the fruits doctrine as applied to a subsequent confession" and stating that "there is much in the Court's opinion that suggests that the fruits doctrine should also be inapplicable to physical evidence acquired through a <u>Miranda</u>-violative confession"). The holdings in <u>Tucker</u> and <u>Elstad</u> could not be any clearer: the "tainted fruits" analysis applies only when a defendant's constitutional rights have been infringed. <u>See, e.g.</u>, <u>Elstad</u> at 305 (noting that the "`fruit of the poisonous tree' [doctrine] assumes the existence of a constitutional violation"); <u>id.</u> at 308 (noting that "[s]ince there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in <u>Wong Sun</u> "); <u>id.</u> (noting under the <u>Wong Sun</u> doctrine "that fruits of a constitutional violation must be suppressed"). It is well established that the failure to deliver <u>Miranda</u> warnings is not itself a constitutional violation.**9** As a result,

---

tree." <u>Id.</u> (citing <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963)). However, the "tainted fruit" discussion in <u>Mobley</u> was neither necessary for the Court's actual holding nor asserted as a correct statement of the law and can be best described as dicta. <u>See Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.</u>, 839 F.2d 1009, 1019 n.3 (4th Cir. 1988) (Murnaghan, J., concurring in part and dissenting in part) (stating that "[t]o reach out and decide what need not be decided is frequently denigrated as dictum"). As a result, the district court was not bound by <u>Mobley</u> in this case. <u>See U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership</u>, 115 S. Ct. 386, 391 (1994) (observing that a court may refuse to follow dicta contained in a prior decision).

**9** "The prophylactic <u>Miranda</u> warnings . . . are `not themselves

rights
protected by the Constitution.'" <u>New York v. Quarles</u>, 467 U.S. 649, 654
(1984) (quoting <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974)); <u>see also</u>
<u>Oregon v. Elstad</u>, 470 U.S. 298, 306 (1985) (noting that the <u>Miranda</u> exclusionary rule "may be triggered even in the absence of a Fifth Amendment violation"); <u>Edwards v. Arizona</u>, 451 U.S. 477, 492 (1981) (Powell, J., concurring) (noting that the Court in <u>Miranda</u> "imposed a
general prophylactic rule that is not manifestly required by anything in
the text of the Constitution"); <u>Miranda v. Arizona</u>, 384 U.S. 436, 467
(1966) (disclaiming any intent to create a "Constitutional straightjacket").

we hold that <u>Wong Sun</u> and its "fruit of the poisonous tree" analysis
is inapplicable in cases involving mere departures from <u>Miranda</u>.
Accordingly, derivative evidence obtained as a result of an unwarned
statement that was voluntary under the Fifth Amendment is never
"fruit of the poisonous tree." <u>See id.</u> at 309; <u>see also Correll v. Thompson</u>, 63 F.3d 1279, 1290 (4th Cir. 1995) (noting that evidence
obtained in violation of <u>Miranda</u> is not necessarily tainted), <u>cert</u>.
<u>denied</u>, 116 S. Ct. 688 (1996); <u>United States v. Crowder</u>, 62 F.3d 782,
786-88 (6th Cir. 1995) (noting that the "fruit of the poisonous tree"
doctrine does not apply to evidence obtained as a result of an
unwarned statement if the statement was voluntary under the Fifth
Amendment), <u>cert. denied</u>, 116 S. Ct. 731 (1996); <u>United States v</u>.
<u>McCurdy</u>, 40 F.3d 1111, 1116-117 (10th Cir. 1994) (same).

B.

In light of our conclusion that a <u>Miranda</u> violation cannot be a
"poisonous tree," whether the challenged evidence must be sup-
pressed as "tainted fruit" turns on whether Elie's statement that he had
weapons in his hotel rooms was involuntary under the Fifth Amend-
ment. The Fifth Amendment guarantees that "[n]o person . . . shall be
compelled in any criminal case to be a witness against himself . . .
without due process of law." As a result, a statement is involuntary
under the Fifth Amendment only if it is "involuntary" within the
meaning of the Due Process Clause. <u>See Elstad</u>, 470 U.S. at 304 (cit-
ing <u>Haynes v. Washington</u>, 373 U.S. 503 (1963)); <u>Chambers v. Florida</u>, 309 U.S. 227 (1940)). In <u>Colorado v. Connelly</u>, 479 U.S. 157
(1986), the Supreme Court held that "coercive police activity is a nec-
essary predicate to the finding that a [statement] is not `voluntary'
within the meaning of the Due Process Clause." <u>Id.</u> at 167. The ques-
tion before us then is whether Elie's statement was the result of coer-
cive police conduct or activity. That question can be answered only

_____

As a result, errors made by law enforcement officers in
administering the
prophylactic <u>Miranda</u> procedures are treated differently from errors that
violate a constitutional right like the Fourth or Fifth Amendment.
<u>See</u>

Elstad 470 U.S. at 306 (noting that the Court"explained in Quarles and
Tucker, [that] a procedural Miranda violation differs in significant
respects from violations of the Fourth Amendment").

13

by reviewing the circumstances under which the statement was made. See Haynes, 373 U.S. at 513-14 (noting that we must review the total-ity of the circumstances surrounding each statement).

After thoroughly reviewing the circumstance under which Elie stated that he had weapons in his hotel rooms, we can find no evidence that the officers used any technique or method that would offend due process. The officers did not harm or threaten to harm Elie if he did not answer their questions. See, e.g. , Beecher v. Alabama, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); Payne v. Arkansas, 356 U.S. 560, 564-65 (1958) (statement obtained after police threatened to turn suspect over to an angry mob); Brown v. Mississippi, 297 U.S. 278, 281-82 (1936) (statement obtained after police whipped suspect). The officers did not deprive Elie of anything. See, e.g., Malinski v. New York, 324 U.S. 401, 403, 406-07 (1945) (statement obtained after forcing suspect to remain naked); Reck v. Pate, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); Brooks v. Florida, 389 U.S. 413, 414-15 (1967) (statement obtained after depriving suspect of food and keeping suspect naked in a small cell). The officers did not subject Elie to a lengthy period of interrogation or isolation. See, e.g., Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) (statement obtained after interrogating suspect virtually nonstop for 36 hours); Davis v. North Carolina, 384 U.S. 737, 52 (1966) (statement obtained after isolating suspect for several weeks). Nor did the officers try to deceive Elie. See, e.g., Spano v. New York, 360 U.S. 315, 323 (1959) (statement obtained after suspect erroneously told that a friend, who had three children and a pregnant wife, would lose his job); Leyra v. Denno, 347 U.S. 556, 559-61 (1954) (statement obtained after hours with psychiatrist trained in hypnosis, although suspect erroneously told that doctor was a general practitioner). In short, we cannot find the kind of coercive police conduct that is necessary to render Elie's statement involuntary under the Due Process Clause.

Elie contends that his unwarned statements at the hotel, which would include his statement concerning the location of the weapons, were involuntary because they were obtained immediately after he

was arrested at gunpoint and placed in handcuffs. Although Elie was arrested at gunpoint and handcuffed in the hotel restaurant, his state-

14

ment concerning the weapons was made after the police holstered their guns and moved him to another part of the hotel. In any event, we have previously held that neither the drawing of a gun by the interrogating officer nor the handcuffing of the confessor "establish[es] involuntariness in and of [itself]." United States v. Seni, 662 F.2d 277, 281-82 (4th Cir. 1981) (holding in custodial interrogation case that voluntariness is "to be determined from the `totality of all the surrounding circumstances'" (quotation and citations omitted)).

Because a defendant must demonstrate that the police activity used to elicit the incriminating statement was coercive, it is not surprising, as Judge Posner has noted, that "very few incriminating statements, custodial or otherwise, are held to be involuntary." United States v. Rutledge, 900 F.2d 1127, 1129 (7th Cir. 1990). We find that this case is no exception. Elie's incriminating statement was elicited without the aid of any coercive conduct on the part of the officers. Specifically, nothing in the record suggests that Elie's "will was overborne." See Reck, 367 U.S. at 440. As a result, Elie's statement was voluntary under the Fifth Amendment. Accordingly, we find that the district court erred in suppressing the challenged evidence as "fruit of the poisonous tree."

III.

Although we conclude that the district court erred in suppressing the evidence found in Elie's hotel rooms as "fruit of the poisonous tree," there must be a basis under the Fourth Amendment for allowing the Government to introduce the evidence in its case in chief. It is well established that "[t]he Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). However, voluntary consent to a search, which the Government contends Elie gave, is such an exception. See id.

In determining whether Elie's consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In viewing the totality of the circumstances, we look for

15

guidance to the factors this Court recently set forth in Lattimore, 87
F.3d at 650. According to Lattimore:

> [I]t is appropriate to consider the characteristics of the
> accused (such as age, maturity, education, intelligence, and
> experience) as well as the conditions under which the con-
> sent to search was given (such as the officer's conduct; the
> number of officers present; and the duration, location, and
> time of the encounter).

Id.

Whether Elie voluntarily consented to the search of his hotel rooms
is a factual question. See id. As a result, this court must affirm the
determination of the district court unless its findings are clearly erro-
neous. See id.; cf. Anderson v. City of Bessemer City, N.C., 470 U.S.
564, 573-74 (1985) (holding that a district court's finding that consent
was voluntary can be reversed only if the district court's view of the
evidence is implausible in light of the entire record). With that having
been said, we note that the district court had no occasion to determine
whether Elie voluntarily consented to the search of his hotel rooms
because it found that Elie's unwarned statement automatically tainted
the evidence found in the search. Normally we would remand a case
in this situation for the district court to make the necessary factual
findings. However, we believe, for the reasons that follow, that
remand is unnecessary in this case.

In determining whether consent to search was given voluntarily, we
are instructed by Lattimore to consider the characteristics of the
accused. 87 F.3d at 650 (mentioning age, maturity, education, intelli-
gence, and experience). These factors are identical to the factors that
the district court considered when it determined that Elie knowingly
waived his Miranda rights by speaking to Detective Petta and the
DSS agents. As a result, the district court has already made the neces-
sary findings of fact.

The district found that Elie was intelligent, well educated, and
familiar with the criminal justice system and its consequences. In
making these findings of fact, the district court noted that Elie

is
forty-six years old, speaks fluent English, holds an advanced degree

16

in chemistry, and was aware of his <u>Miranda</u> rights. Specifically, the district court noted that it was Elie who asked the officers why he had not been given his <u>Miranda</u> warnings.

We find that the district court's findings were not clearly erroneous and, in fact, were supported by additional evidence in the record. For example, the district court's finding that Elie was familiar with the criminal justice system extends well beyond his knowledge of <u>Miranda</u>. Elie claims to have had significant law enforcement respon- sibilities with the Haitian Government, at one point boasting to Detec- tive Petta that he "almost invented law enforcement" in Haiti. (J.A. at 47, 51, 76.) In addition, by revoking his consent to search certain documents in his hotel rooms, Elie demonstrated that he was aware of his right to refuse consent to the search of his hotel rooms. Based on this record, it is clear that Elie was no newcomer to the law. <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 424-25 (1976) (noting that the absence of any indication that the defendant was a"newcomer to the law" is an important factor in determining whether consent was vol- untary).

In determining whether consent to search was given voluntarily, we are also instructed by <u>Lattimore</u> that it is appropriate to consider the conditions under which the consent to search was given. 87 F.3d at 650 (mentioning factors such as the officer's conduct; the number of officers present; and the duration, location, and time of the encoun- ter). Obviously, the district court did not make these findings when it determined that Elie had waived his <u>Miranda</u> rights by speaking to Detective Petta and the DSS agents. Nevertheless, after carefully reviewing the record, we find nothing in the conditions surrounding Elie's consent that would render it involuntary. Specifically, the inci- dent occurred during the middle of the afternoon in a hotel lobby and was not of inordinate duration. Any tension created by the initial arrest, where Elie was confronted at gunpoint, ordered to the floor,

and handcuffed, had been defused by the time Elie consented to the search. The police had long since holstered their guns and Elie had been moved from the hotel restaurant, where the arrest occurred, to another part of the hotel. In any event, as we previously noted, neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused "establish[es] involuntariness in and of [itself]." Seni, 662 F.2d at 281 (citations omitted). Moreover, although there were at least

17

six officers present when Elie granted his consent to search, nothing in the record indicates an environment that was coercive or intimidating. In fact, Elie engaged the officers in friendly conversation throughout the encounter. As one officer explained, Elie "spoke non-stop; we couldn't shut him up." (J.A. at 121.)

Furthermore, Elie's warned statements to Detective Petta make it unmistakably clear that his consent was given voluntarily. For example, after telling Detective Petta that his hotel rooms contained the evidence he had collected during the course of his undercover investigation of the Haitian Ambassador, Elie warned that he did not "want to go back to th[ese] room[s] and find that the[y] ha[d] been cleaned out by people other than [the police]." (J.A. at 48.) Later, in an attempt to illustrate the importance of securing the property in question, Elie dramatically declared: "[The Government can] put me in solitary, but please, the stuff that I have in the room[s] must be secured." (J.A. at 72.) In fact, Elie's overriding concern during his interview with Detective Petta was not the pending assault charges, but the security of his property. See, e.g., (J.A. at 57 (stating that the contents of his hotel rooms were "extremely important")); (J.A. at 64 (noting that the hotel rooms are not secure and that he feared the officers did not secure all of his property)); (J.A. at 80 (explaining that he insisted that the officers secure the papers in his hotel rooms)). In light of the entire record, the only plausible conclusion is that Elie voluntarily consented to the search of his hotel rooms.

Elie, of course, disagrees. He argues that his consent to search the hotel rooms was not voluntary because it followed a Miranda violation. Although the absence of Miranda warnings is a factor to be considered in assessing whether a defendant's consent was given voluntarily, see Watson, 423 U.S. at 424-25, we must look at the totality of the circumstances in determining whether Elie's consent was given voluntarily. For the reasons already stated, and in light of the fact that the district court specifically found that Elie was aware

of his <u>Miranda</u> rights, we find this argument to be without merit.

Elie also argues that his consent was not voluntary because the officers failed to inform him of his right to refuse consent. However,
"the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary."

18

Lattimore, 87 F.3d at 650. In any event, Elie's argument is belied by
his own conduct. By revoking his consent to search certain documents
in his rooms, Elie conclusively demonstrated that he knew of his right
to refuse consent. See Bustamonte, 412 U.S. at 249 (noting that
although the accused's knowledge of his right to refuse consent is not
a prerequisite in establishing consent, it is a factor). Consequently, we
find this argument to be without merit.

Finally, Elie argues that his consent was not voluntary because he
was given a "Hobson's choice" when told that he had the option of
having his weapons and other possessions secured by either hotel
management or the police. We reject this argument as well. The
police can give a defendant truthful information, even if that informa-
tion forces the defendant to make a choice between two unpleasant
alternatives. See United States v. Pelton, 835 F.2d 1067, 1072 (4th
Cir. 1987) (noting that "`a law enforcement officer may properly tell
the truth to the accused'" (quoting United States v. Williams, 479 F.2d
1138, 1140 (4th Cir. 1973)). Indeed, "[t]ruthful statements about [the
defendant's] predicament are not the type of`coercion' that threatens
to render a statement involuntary." Id. at 1073.

IV.

In conclusion, we find that the district court erred in suppressing
the challenged evidence as "fruit of the poisonous tree." The "fruit of
the poisonous tree" doctrine simply does not apply where, as here, the
fruits are discovered as the result of a statement obtained in violation
of Miranda. In addition, we find that Elie voluntarily consented to the
search of his hotel rooms. As a result, the district court's orders sup-
pressing the firearms and firearms receipts found in Elie's hotel
rooms, the firearms transaction records obtained from Gilbert Small
Arms, and the testimony of the individual at Gilbert Small Arms who
sold Elie the firearms are reversed, and the case is remanded for fur-
ther proceedings.

REVERSED

HALL, Circuit Judge, dissenting:

Where an accused's supposed consent to a police search of his person or property is at issue, the law is clear that the reviewing court

19

must examine the totality of the circumstances to ensure that the con-
sent was voluntarily given. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218,
227 (1973). A court should consider (1)the personal characteristics
of the accused, (2)the conditions under which the consent was
obtained, and (3)whether the accused knew that he could lawfully
withhold his consent. <u>United States v. Lattimore</u>, 87 F.3d 647, 650
(4th Cir. 1996) (en banc).

In this case, the court below has made specific findings regarding
only the first of the three <u>Lattimore</u> factors, <u>i.e.</u>, that Elie was a
mature, intelligent, educated adult, who was not entirely unfamiliar
with our criminal justice system. Confronted with the district court's
silence as to the second and third factors, the majority has deemed it
appropriate to make its own findings. <u>See ante</u> at 15-18. In the course
of its assumption of the district court's role, the majority has chosen
to emphasize Elie's relative sophistication, while simultaneously
downplaying the manner in which the police obtained Elie's consent
to search his motel rooms.

The conduct of the police in this case was not up to standard. After
Elie was handcuffed, Sgt. William Desmond asked him whether he
would rather have the contents of his rooms "secured" by the motel
management or by the police. The question is reminiscent of the
hoary chestnut "When did you stop beating your wife?"; it relies on
a wholly speculative assumption to guarantee the answer desired by
the questioner. There was, of course, no reason for Desmond to pre-
sume that Elie would wish to have his possessions"secured" by any-
one, or that Elie could not himself arrange for the security of his
effects.

Under ordinary circumstances, Desmond's concern for an
arrestee's possessions might have been laudable. But these were no
ordinary circumstances. During the course of the investigation, Des-
mond learned (1)that Elie had made serious threats against officials
of the Haitian embassy and (2)that he had ready access to firearms.
It is certainly understandable that Desmond would be concerned that
the targets of Elie's threats were at considerable risk of bodily harm.
Unfortunately, Desmond had no probable cause to believe that Elie
had committed any firearms violations; he could arrest Elie only for

assault and battery, a relatively minor charge that would ensure Elie's
detention for but a short while.

Viewed in the above light, one must acknowledge the probability that Desmond's questioning was predesigned to trick Elie into grant-
ing the arresting officers permission to search his motel rooms for evidence of crimes more serious than that described in the arrest warrant.**1** If Desmond were found to have engaged in a deliberate sub-
terfuge, then that fact -- either alone or in conjunction with the some-
what intimidating tactics used by the police during the arrest -- would support the conclusion that Elie, notwithstanding the evidence
of his sophistication, did not voluntarily consent to the search.**2**

An accurate analysis under <u>Lattimore</u> depends, in this case, on an evaluation of the credibility of the government's witnesses. The dis-
trict court, unlike the majority, has observed the witnesses' demeanor
and has, no doubt, made a preliminary assessment of their credibility.

I would afford the district court the opportunity to perform its assigned role as the finder of fact. On remand, the court might well
find that Elie, despite his apparent worldliness, did not voluntarily
consent to the search of his motel rooms. The government could appeal such a finding, but we would be bound to let it stand unless it were clearly erroneous. <u>Lattimore</u> at 650-51. The majority has fore-

_____

**1** Although I do not subscribe to the majority's conclusion that evidence
may <u>never</u> be suppressed as the "fruit" of a <u>Miranda</u> violation, <u>ante</u> at
9-13, I agree that the district court's focus on Elie's failure to receive
<u>Miranda</u> warnings was misplaced in this case. In my view, Desmond would likely have tried to obtain Elie's consent to search even had Elie,
in response to Desmond's unwarned questioning, denied having firearms
in his motel rooms. It seems far more probable that the seized evidence
were fruits of an invalid consent search than of the <u>Miranda</u> violation.
**2** The government has argued that the testimony and other evidence obtained from the firearms dealer, who was identified from receipts

found in Elie's rooms, would have been inevitably discovered as the result of Elie's mentioning the transactions during the course of his for-
mal interrogation. The government has neglected to acknowledge the likelihood that, had the arresting officers not searched Elie's motel
rooms, he would have had no reason to refer to the firearms during his
questioning.

closed this possibility by circumventing the long-settled practice of
limited appellate review. Though I am certain that the majority
intends nothing more than to achieve the just result in this case,
I can-
not approve of its approach; our job is difficult enough without
assuming the mantle of factfinder.

I respectfully dissent.

22