UNITED STATES

v.

**Kevin Gerard PLASKETT, Defendant.**

**No. CRIM. 2:99CR182.**

United States District Court,
E.D. Virginia.
Norfolk Division.

Jan. 24, 2000.

James A. Metcalfe, AUSA, United States Attorney's Office, Norfolk, VA, for USA.

Ayodele Marlene Ama, Norfolk, VA, George A. Anderson, Robinson, Footman–Banks & Anderson, Norfolk, VA, for Defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

This matter is before the Court on Defendant's Motion to Suppress. For the reasons outlined below, Defendant's motion is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 21, 1999, a Virginia State Trooper stopped defendant Kevin Gerard Plaskett ("Plaskett") for driving a vehicle with a broken taillight. A search of Defendant's vehicle and a secret compartment found therein resulted in the discovery of $2,150, a loaded Jennings nine millimeter semiautomatic pistol with the serial number removed, a loaded Glock .45 caliber semiautomatic pistol, numerous boxes of ammunition, a pair of handcuffs, a bulletproof vest, a 250,000 volt stun gun, a small set of hand scales, packaging material, an inert hand grenade, a box of baking soda with a receipt dated April 1999, and a glass jar containing 3.91 grams of cocaine base.

On November 18, 1999, a federal grand jury charged Defendant in a Three–Count Indictment. Count One charged Defendant with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). Count Two charged Defendant with carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Count Three charged Defendant with possession of a firearm which had the serial number removed in violation of 18 U.S.C. § 922(k). On December 20, 1999, Defendant filed the instant Motion to Suppress alleging that the search of his vehicle violated his Fourth Amendment rights. On January 20, 2000, the Court held an evidentiary hearing to resolve factual issues raised by Defendant's Motion to Suppress.

On June 21, 1999, Virginia State Trooper Bill Talbert ("Talbert") stopped a Plymouth Voyager mini-van which had a broken taillight and was proceeding south on Route 13 in Accomac County, Virginia. The driver of the mini-van, defendant Plaskett, was accompanied by one passenger at the time, Tecumta Tiwoni ("Tiwoni"). After stopping the vehicle, Trooper Talbert approached the mini-van on the driver side and asked Plaskett for his license and registration. As Plaskett opened a sliding box located under the front passenger seat of the mini-van to retrieve his registration, Trooper Talbert noticed a pair of powered rubber gloves in the sliding box. The presence of the gloves made Talbert suspicious, but not suspicious enough to warrant a search of the vehicle. Talbert informed Plaskett of the reason for the stop, and then had Plaskett stand at the rear of the vehicle while Talbert applied the mini-van's brake. Talbert and Plaskett then proceeded to Talbert's patrol vehicle, where Talbert checked Plaskett's license with the Division of Motor Vehicles computer. While seated in the patrol car awaiting the information from the license check, Talbert asked Plaskett where he was coming from. Plaskett responded that he was coming from Ocean City, Maryland. Talbert then asked Plaskett's passenger, Tiwoni, the same question. Tiwoni told Talbert that they were coming from New York. The conflicting responses from Plaskett and Tiwoni raised Trooper Talbert's suspicions. By this point, Talbert wanted to search the mini-van, but he did not feel he had probable cause to do so. Talbert called Virginia State Trooper C.S. Wade and requested that he come to the scene to assist. Trooper Wade routinely carried with him a drug canine.

Trooper Talbert then issued a summons to Plaskett for defective equipment and advised him that he was free to go.[1] What

---

1. It is interesting to note that during the search, troopers recovered from the vehicle a prior traffic ticket that was issued on April 8, 1999 to Plaskett for a defective brake light. Plaskett testified that the brake light was repaired the same day he received the prior

happened next was disputed at the evidentiary hearing. According to Trooper Talbert, as Plaskett started to exit the patrol vehicle, Talbert asked Plaskett if he had a second, to which Plaskett replied, "yeah." Talbert maintains that he then asked Plaskett if he had anything illegal in the mini-van like guns or drugs, to which Plaskett allegedly replied, "No, do you want to look?" Contrary to Trooper Talbert, Plaskett maintains that he never asked Talbert if he wanted to look in the mini-van. Plaskett claims that Talbert asked to search the vehicle, to which Plaskett responded, "for what purpose?"

Soon after this exchange between Plaskett and Talbert, Trooper Wade arrived on the scene with his drug canine. Tiwoni, who had remained in the mini-van up to this point, then asked Trooper Talbert if he could use the bathroom. Talbert said yes, and according to Talbert, proceeded to frisk Tiwoni with Tiwoni's consent. Talbert discovered what appeared to be a large amount of money in Tiwoni's sweat pants pocket. Tiwoni claims he had approximately $300 in cash on his person at the time. According to Trooper Talbert, after frisking Tiwoni he asked Plaskett if he could frisk him as well. Talbert maintains that Plaskett did not respond verbally to Talbert's request, but instead placed his hands in the air as if ready to be frisked. Talbert proceeded to frisk Plaskett but found nothing. Talbert and Tiwoni then walked to some bushes about one hundred yards away from the mini-van so Tiwoni could use the bathroom. Meanwhile, Trooper Wade waited with Plaskett beside the mini-van. During this time, Trooper Wade made a visual check of the outside of the mini-van and saw by looking under the vehicle what appeared to be some kind of straight metal or false floor underneath the driver's side. When Talbert and Tiwoni returned to mini-van, Trooper Wade told Talbert about the false

floor under the driver's side. Talbert then got on his hands and knees and looked underneath the mini-van to see the false floor for himself. The false floor was clearly visible underneath the vehicle, and Talbert felt it was a secret compartment. Talbert tapped on the compartment and discovered that it sounded hollow. Trooper Talbert had seen false floorboards and secret compartments in vehicles before, and based upon his experience, he knew they were often used to carry contraband. Accordingly, he and Trooper Wade handcuffed Plaskett and Tiwoni, advised them that there were under investigative detention until it could be determined what was in the false compartment, and placed them in the back seat of Talbert's patrol vehicle. Talbert then opened the mini-van's driver-side door and quickly discovered an access door to the hidden compartment in the driver-side front floorboard.[2] Using a pry bar, Trooper Wade then opened the door to the compartment, wherein the troopers discovered the contraband described above.

## II. DISCUSSION

"It is well established that '[t]he Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable.'" *United States v. Elie,* 111 F.3d 1135, 1144 (4th Cir.1997) (quoting *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996) (en banc)). Voluntary consent to search and probable cause to search an automobile are both valid exceptions to the warrant requirement. Defendant maintains that the search of the mini-van was done without consent and without probable cause, and therefore violated his Fourth Amendment rights. Accordingly, Defendant argues that the contraband discovered during the search should be sup-

---

ticket, and that the prior ticket was therefore removed from his record.

**2.** Trooper Talbert testified at the evidentiary hearing that the access door was well-hidden, and would not have been apparent to a layperson.

pressed. The Government contends that Trooper Talbert did obtain voluntary consent to search from Plaskett, and that in the alternative, the search was supported by probable cause.

## A. Consent to Search

■ The Government contends that Trooper Talbert had consent to search the mini-van from Plaskett prior to searching the vehicle. Plaskett denies ever giving consent to search and maintains that when Talbert asked if he could search the vehicle, Plaskett responded only by asking "for what purpose." The question of whether Plaskett freely and voluntarily consented to the search of the mini-van is a factual question, see *Lattimore*, 87 F.3d at 650, to be determined by examining "the totality of the circumstances surrounding the consent." *Elie*, 111 F.3d at 1144. In viewing the totality of the circumstances,

> it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter).

*Lattimore*, 87 F.3d at 650.

■ In the present case, the Court finds that Plaskett did consent to a search of the mini-van. In making this finding, the Court credits the testimony of Trooper Talbert and rejects Plaskett's testimony with regard to the verbal exchange between Plaskett and Talbert. Thus, the Court finds that Trooper Talbert did, in fact, ask Plaskett if he had any guns or drugs in the mini-van, and that Plaskett responded by saying "No, do you want to look?" The Court notes that in this situation, Plaskett had no reason not to consent to the search. Either Plaskett did not know of the existence of the secret compartment or that contraband was stowed therein, or he felt the secret compartment was so well concealed that Trooper Talbert

would not discover its presence. In either case, it would be logical for Plaskett to consent to the search. Furthermore, there is no reason to doubt Trooper Talbert's testimony.

Moreover, the Court finds that Plaskett's consent to search the mini-van was freely and voluntarily given. After Talbert issued the summons to Plaskett and before questioning him about the presence of contraband, he advised Plaskett that he was free to go. Thus, Talbert ended his detention of Plaskett and began a consensual encounter with Plaskett before questioning Plaskett about the presence of contraband in the mini-van. *See United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.1992) (stating that if a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter is consensual). Plaskett was free to leave and did not need to answer any of Trooper Talbert's questions. However, instead of declining to answer, when Trooper Talbert asked Plaskett if he had any contraband in the mini-van, Plaskett answered by saying "No, do you want to look?" Talbert was the only officer on the scene at the time of consent, and there is nothing about either Plaskett's or the officer's conduct, or any other element of the encounter which would suggest that Plaskett's consent was not free and voluntary. Accordingly, the Court finds that based on the totality of the circumstances, Plaskett's consent was freely and voluntarily given.

## B. Probable Cause to Search

■ Even if Plaskett had not consented to a search of the mini-van, the Court finds that the warrantless search of the secret compartment and the mini-van was lawful and supported by probable cause. "In *United States v. Ross*, 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982), the Supreme Court held that police officers 'who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed

somewhere within it ... may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant.'" *United States v. Poole,* 718 F.2d 671, 674 (4th Cir.1983).

In the present case, Trooper's Talbert and Wade had probable cause to search the mini-van as soon as Trooper Wade discovered the presence of a false floorboard and secret compartment. The false floorboard was visible to Wade and Talbert from outside the mini-van simply by kneeling down and looking underneath the vehicle. Thus, the false floorboard and secret compartment itself was in plain view, and accordingly the troopers did not undertake an unconstitutional search to discover it. Trooper Talbert testified that in his experience, false floorboards and secret compartments are often used to stow contraband. This knowledge, coupled with the discovery of the false floorboard and the secret compartment itself gave Troopers Talbert and Wade probable cause to search.

This decision is in line with the decisions of several other courts that have decided whether the presence of a secret compartment provides probable cause to search. In *United States v. Price,* the Fifth Circuit examined the issue of probable cause and secret compartments after a defendant was stopped while driving a Chevrolet El Camino by a United States Border Patrol Agent at an immigration checkpoint twenty miles inside the United States—Mexican border. 869 F.2d 801 (5th Cir.1989). In that case, after visually inspecting the vehicle, including looking underneath the vehicle, the Border Patrol Agent determined that the vehicle contained a secret compartment. A search of the compartment revealed seventy-six packages containing cocaine. *See id.* at 802–03. After the defendant moved to suppress the cocaine on grounds the agent did not have probable cause to search the vehicle, the Fifth Circuit held that "[o]nce the agents had discovered the secret compartment they had probable cause to search the

compartment itself." *Id.* at 804. The Eight Circuit reached a similar conclusion in *United States v. Martel–Martines,* 988 F.2d 855 (8th Cir.1993). In that case, a Missouri Highway Patrol Officer stopped a Nissan pickup truck for speeding. According to the officer, the driver of the truck gave evasive and inconsistent answers to routine questions. A visual examination of the truck bed revealed that it had been lowered, and that the underside had been modified and an inaccessible hidden compartment built. *Id.* at 858–59. A search of the compartment revealed 52.15 kilograms of cocaine. *See id.* at 857. After the driver moved to suppress the cocaine as fruit of an unlawful search, the district court held that the driver had consented to the search. *See id.* On appeal, the Eighth Circuit held that even if the driver had not consented to the search, the officer had probable cause to search the hidden compartment based on the discovery of the compartment and the driver's answers to the officer's questions. *See id.* at 859. Similarly, in *United States v. Toro–Pelaez,* the United States District Court for the District of Kansas relied almost exclusively on the presence of a secret compartment in holding that an officer had probable cause to search the defendant's truck. 893 F.Supp. 963, 966 (D.Kan.1995) ("The court finds that probable cause existed to search the vehicle after the troopers verified the existence of the suspected hidden compartment.") In so holding, the court gave great weight to the officers' prior experiences with secret compartments. *See id.*

The Fourth Circuit has also considered the presence of secret compartments in the determination of probable cause. *See United States v. Bullock,* 94 F.3d 896 (4th Cir.1996). In *Bullock,* two Maryland State Police Officers stopped a Nissan Maxima for speeding on Route 13 in Salisbury, Maryland. *See id.* at 897. The driver was unable to produce a driver's license or any other identification. *See id.* When the driver opened the center console to re-

trieve his registration, one of the officers observed a large bundle of cash secured with a rubber band. *See id.* The officer also observed two cellular telephones and a beeper elsewhere in the car. *See id.* at 897–98. The driver gave the officers consent to search his vehicle. *See id.* at 898. During the search, the officers discovered a clip of ammunition and a secret compartment which contained 9.7 kilograms of cocaine. Upon moving to suppress the cocaine, the driver argued that his consent to search the vehicle did not include consent to search the secret compartment. *See id.* at 899. The Fourth Circuit declined to reach the question of whether the driver's consent included consent to search the secret compartment, and instead held that the officers had probable cause to search the secret compartment without a warrant. *See id.* In support of probable cause, the court pointed to the officer's observation of the cash, cellular telephones, and beeper, as well as the officer's discovery of the clip of ammunition, and the driver's nervous behavior after the secret compartment was discovered. *See id.*

### III. CONCLUSION

It is the finding of the Court that Defendant freely and voluntarily gave his consent to the search of the mini-van. However, even if Defendant had not consented to the search, Troopers Talbert and Wade had probable cause to search the secret compartment after they observed the false floorboard in plain view from outside the vehicle and determined there to be a secret compartment. Although the Court finds that the discovery of the secret compartment alone provided probable cause to search, as in *Bullock,* in this case there were several other factors supporting probable cause. Trooper Talbert's discovery of powdered rubber gloves in the sliding box beneath the passenger seat, the inconsistent statements of Defendant and Tiwoni, and the presence of a large amount of cash in Tiwoni's pocket all support a finding of probable cause. Since the Defendant freely and voluntarily consented to

the troopers' search of the secret compartment and the mini-van, or in the alternative, probable cause existed to support the search, Defendant's Fourth Amendment rights were not violated. Accordingly, Defendant's Motion to Suppress is **DENIED.**

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to Defendant's counsel and to the United States Attorney.

**IT IS SO ORDERED.**